Theodore J. Boutrous, Jr., SBN 132099
    tboutrous@gibsondunn.com
Andrea E. Neuman, SBN 149733
    aneuman@gibsondunn.com
William E. Thomson, SBN 187912
    wthomson@gibsondunn.com
Joshua S. Lipshutz, SBN 242557
    jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  213.229.7000
Facsimile:  213.229.7520

Herbert J. Stern (*pro hac vice* application forthcoming)
    hstern@sgklaw.com
Joel M. Silverstein (*pro hac vice* application forthcoming)
    jsilverstein@sgklaw.com
STERN & KILCULLEN, LLC
325 Columbia Turnpike, Suite 110
P.O. Box 992
Florham Park, NJ 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664

Attorneys for Defendants CHEVRON
CORPORATION and CHEVRON U.S.A., INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INC.,<br><br>          Plaintiff,<br><br>          v.<br><br>CHEVRON CORP.; CHEVRON U.S.A., INC.; EXXON MOBIL CORP.; EXXONMOBIL OIL CORP.; BP P.L.C.; BP AMERICA, INC.; ROYAL DUTCH SHELL PLC; SHELL OIL PRODUCTS CO. LLC; CITGO PETROLEUM CORP.; CONOCOPHILLIPS; CONOCOPHILLIPS CO.; PHILLIPS 66; TOTAL E&P USA INC.; TOTAL SPECIALTIES USA INC.; ENI S.P.A.; ENI OIL & GAS INC.; ANADARKO PETROLEUM CORP.; OCCIDENTAL PETROLEUM CORP.; OCCIDENTAL CHEMICAL CORP.; REPSOL S.A.; REPSOL ENERGY NORTH AMERICA CORP.; REPSOL TRADING USA CORP.; MARATHON OIL CO.; MARATHON OIL | CASE NO. 3:18-cv-7477<br><br>**NOTICE OF REMOVAL BY DEFENDANTS CHEVRON CORPORATION AND CHEVRON U.S.A., INC.**<br><br>[Removal from the Superior Court of the State of California, County of San Francisco, Case No. CGC-18-571285]<br><br>Action Filed:    November 14, 2018 |

1   CORP.; MARATHON PETROLEUM CORP.;
    HESS CORP.; DEVON ENERGY CORP.;
2   DEVON ENERGY PRODUCTION CO., L.P.;
    ENCANA CORP.; APACHE CORP.; and
3   DOES 1 through 100, inclusive,

4           Defendants.

**TO THE CLERK OF THE ABOVE-TITLED COURT AND TO PLAINTIFF PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INC. AND ITS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT Defendants Chevron Corp. and Chevron U.S.A., Inc. (collectively, "the Chevron Parties"), remove this action—with reservation of all defenses and rights—from the Superior Court of the State of California for the County of San Francisco, Case No. CGC-18-571285, to the United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1331, 1332(d), 1334, 1441(a), 1442, 1452, 1453(b), and 1367(a), and 43 U.S.C. § 1349(b). All Defendants that Plaintiff has served or purported to serve have consented to this Notice of Removal. Consequently, without conceding that any such Defendant has been properly joined and served in this action, it is clear that any and all defendants who have been properly joined and served have joined in the removal of this action.

This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because the Complaint arises under federal laws and treaties, presents substantial federal questions, and asserts claims that are completely preempted by federal law. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any claims over which it does not have original federal question jurisdiction because they form part of the same case or controversy as those claims over which the Court has original jurisdiction. As set forth below, removal is proper pursuant to 28 U.S.C. §§ 1441, 1442, 1446, 1452, and 1453, and 43 U.S.C. § 1349(b).

In addition, the Complaint is without legal merit and, at the appropriate time, Defendants will move to dismiss Plaintiff's claims pursuant to Rule 12 of the Federal Rules of Civil Procedure.

Through its Complaint, the Pacific Coast Federation of Fishermen's Associations calls into question longstanding decisions by the Federal Government regarding, among other things, national security, national energy policy, environmental protection, development of outer continental shelf lands, the maintenance of a national petroleum reserve, mineral extraction on federal lands (which has produced billions of dollars for the Federal Government), and the negotiation of international agreements bearing on the development and use of fossil fuels. Many of the Defendants have contracts with the Federal Government to develop and extract minerals from federal lands and to sell fuel

and associated products to the Federal Government for the Nation's defense.  The gravamen of the Complaint seeks either to undo all of those Federal Government policies or to extract "compensation" from Defendants and force them to relinquish the profits they obtained by having contracted with the Federal Government or relied upon national policies to develop fossil fuel resources.

In the Complaint's view, a state court may regulate the nationwide—and indeed, worldwide—economic activity of key sectors of the American economy, which supply the fuels that power production and innovation, power boat engines and facilitate international shipping, keep the lights on, and that form the basic materials from which innumerable consumer, technological, and medical devices are fashioned.  Though nominally asserted under state law, the Complaint puts at issue long-established federal statutory, regulatory, and constitutional issues and frameworks, and it seeks to hold a small number of oil and gas companies—who themselves are responsible for a mere fraction of global greenhouse gas emissions—liable for the alleged effects of *global* warming, including increasing average sea temperatures, increasingly frequent and intense marine heatwaves, and algae blooms allegedly caused by greenhouse gas emissions from countless nonparties.

This case is about *global* emissions.  Plaintiffs allege that the worldwide use of fossil fuels "plays a direct and substantial role in the unprecedented rise in emissions of greenhouse gas pollution," which "is the main driver of the gravely dangerous changes occurring to the global climate." Compl. ¶ 3.  Importantly, however, Plaintiffs' claims are not limited to harms caused by fossil fuels extracted, sold, marketed, or used in California.  Instead, their claims depend on Defendants' nationwide and global activities, as well as the activities of billions of fossil fuel consumers, including not only entities such as the U.S. government and military, but also hospitals, schools, manufacturing facilities, and individual households.

This lawsuit implicates bedrock federal-state divisions of responsibility, and appropriates to itself the direction of such federal spheres as nationwide economic development, international relations, and America's national security.  Reflecting the substantial and uniquely federal interests posed by greenhouse gas claims like these, the Supreme Court and the Ninth Circuit have recognized that causes of action of the types asserted here are governed by federal common law, *not* state law.

Gibson, Dunn & Crutcher LLP

2

1   The Complaint has no basis in law and is inconsistent with serious attempts to address im-

2   portant issues of national and international policy.  Accordingly, Plaintiff's Complaint should be

3   heard in this federal forum to protect the national interest by its prompt dismissal.

4   **I.      TIMELINESS OF REMOVAL**

5          1.      Plaintiff, the Pacific Coast Federation of Fishermen's Associations, filed a Complaint

6   against the Chevron Parties and other named Defendants in the Superior Court for the County of San

7   Francisco, California, Case No. CGC-18-571285, on November 14, 2018.  A copy of all process,

8   pleadings, or orders in the possession of the Chevron Parties is attached as Exhibit A to the Declara-

9   tion of William E. Thomson, filed concurrently herewith.

10          2.      This notice of removal is timely under 28 U.S.C. § 1446(b) because it is filed fewer

11   than 30 days after service.  28 U.S.C. § 1446(b).  All Defendants that have been served (or purport-

12   edly served) as of this date have consented to this removal.  *See* Thomson Decl. ¶ 4.  In addition, con-

13   sent to this removal petition is not required because removal does not proceed "solely under 28

14   U.S.C. § 1441."  28 U.S.C. § 1446(b)(2)(A); *see also, e.g.*, 28 U.S.C. § 1452.[1]

15   **II.     SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL**

16          3.      Plaintiff is the Pacific Coast Federation of Fishermen's Associations, Inc.  Plaintiff

17   brings claims against Defendants for alleged injuries relating to climate change, including damages

18   and injunctive relief from injuries suffered from "global warming" and other "changes occurring to

19   the global climate" including increasing average sea temperatures, increasing frequency and intensity

20   of marine heatwaves, the destabilization and disturbance of marine wildlife populations, and an in-

21   creasing frequency and severity of algae blooms.  Compl. ¶¶ 1, 3.  Plaintiff asserts the following

22   claims:  nuisance; strict liability for failure to warn; strict liability for design defect; negligence; and

23   negligence for failure to warn.  In addition to compensatory and punitive damages, Plaintiff seeks the

---

25   [1]  In filing or consenting to this Notice of Removal, Defendants do not waive, and expressly pre-
26   serve, any right, defense, affirmative defense, or objection, including, without limitation, personal
     jurisdiction, insufficient process, and/or insufficient service of process.  A number of Defendants
27   contend that personal jurisdiction in California is lacking over them, and these Defendants will
     move to dismiss for lack of personal jurisdiction at the appropriate time.  *See Maplebrook Town-*
28   *homes LLC v. Greenbank*, No. 10-CV-03688-LHK, 2010 WL 4704472, at *4 (N.D. Cal. Nov. 12,
     2010) ("removal to federal court counts as a special appearance and does not waive the right to
     object to personal jurisdiction").

"equitable disgorgement of all profits Defendants obtained" through their business of manufacturing, producing, and/or promoting the sale of fossil fuel products (Compl. ¶ 185), as well as "[e]quitable relief, including abatement of the nuisances complained of" in the Complaint (Compl., Prayer for Relief).

4.      Multiple Defendants will deny that any California court has personal jurisdiction, and those Defendants properly before the Court will deny any liability as to Plaintiff's claims.  Defendants expressly reserve all rights in this regard.  For purposes of meeting the jurisdictional requirements for removal only, however, Defendants submit that removal is proper on at least nine independent and alternative grounds.

5.      ***First***, the action is removable under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claims, to the extent that such claims exist, implicate uniquely federal interests and are governed by federal common law, and not state common law.  *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 847, 850 (1985).  The Ninth Circuit has held that comparable claims, in which a municipality alleged that the defendants' greenhouse gas emissions led to global warming-related injuries such as coastal erosion, were governed by federal common law.  *See Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012) ("*Kivalina*").  Federal common law applies only in those few areas of the law that so implicate "uniquely federal interests" that application of state law is affirmatively inappropriate.  *See, e.g.*, *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504, 507 (1988); *Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 424 (2011) ("*AEP*") ("borrowing the law of a particular State would be inappropriate").  As a result, the Ninth Circuit's determination in *Kivalina* that federal common law applies to comparable global warming-related tort claims necessarily means that state law should not apply to those types of claims.  These claims also arise under federal common law because they involve alleged injuries to Dungeness crabs, which are a federal natural resource.  Plaintiff's claims, therefore, (to the extent they exist at all) arise under federal common law, not state law, and are properly removed to this Court.

6.      ***Second***, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because the action necessarily raises disputed and substantial federal questions that a federal forum may

entertain without disturbing a congressionally approved balance of responsibilities between the federal and state judiciaries.  *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005).  In fact, the causes of action as alleged in the Complaint attack federal policy decisions and threaten to upset longstanding federal-state relations, second-guess policy decisions made by Congress and the Executive Branch, and skew divisions of responsibility set forth in federal statutes and the United States Constitution.

7.     ***Third***, this action arises under the Court's admiralty jurisdiction, 28 U.S.C. § 1333, because Plaintiff's alleged torts occurred on the navigable waters of the United States, and because Defendants' conduct allegedly disrupts maritime commerce and has a substantial relationship to traditional maritime activity, *see James B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).

8.     ***Fourth***, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claims are completely preempted by the Clean Air Act and/or other federal statutes and the United States Constitution, which provide an exclusive federal remedy for plaintiffs seeking stricter regulations regarding the nationwide and worldwide greenhouse gas emissions put at issue in the Complaint.

9.     ***Fifth***, Defendants are authorized to remove this action under 28 U.S.C. § 1442(a)(1) because, assuming the truth of Plaintiff's allegations, a causal nexus exists between their actions, taken pursuant to a federal officer's directions, and Plaintiff's claims; they are "persons" within the meaning of the statute; and can assert several colorable federal defenses.  *See Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014).

10.     ***Sixth***, this Court has original jurisdiction over this lawsuit and removal is proper pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), because this action "aris[es] out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, or the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals."  43 U.S.C. § 1349(b); *see also Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

11.     **Seventh,** this Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d) and 1453(b).  Although Plaintiff does not characterize its action as a class action, it alleges that it brings these claims on behalf of its members in a "representative capacity" and is in substance a class action under California law; each of CAFA's statutory requirements are satisfied; and litigation in a federal forum promotes CAFA's overall purpose.

12.     **Eighth,** removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claims are based on alleged injuries to and/or conduct on federal enclaves.  As such, Plaintiff's claims arise under federal-question jurisdiction and are removable to this Court.  *See* U.S. Const., art. I, § 8, cl. 17; *Durham v. Lockheed Martin Corp*., 445 F.3d 1247, 1250 (9th Cir. 2006) ("Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'").

13.     **Ninth, and finally,** removal is authorized under 28 U.S.C. § 1452(a) and 28 U.S.C. § 1334(b) because Plaintiff's state-law claims are related to cases under Title 11 of the United States Code.  Plaintiff alleges that Defendants (improperly defined by Plaintiff to include the conduct of Defendants' subsidiaries, *see, e.g.*, Compl ¶¶ 23(f), 194, 208) engaged in conduct constituting a public nuisance over many decades.  Because Plaintiff's claim is predicated on historical activities of Defendants, including predecessor companies and companies that they may have acquired or with which they may have merged, and because there are hundreds, if not thousands, of non-joined necessary and indispensable parties, there are many other Title 11 cases that may be related.  *See PDG Arcos, LLC v. Adams*, 436 F. App'x 739 (9th Cir. 2011).

14.     For the convenience of the Court and all parties, Defendants will address each of these grounds in additional detail.  Should Plaintiff challenge this Court's jurisdiction, Defendants will further elaborate on these grounds and will not be limited to the specific articulations in this Notice.

### III.     THIS COURT HAS FEDERAL-QUESTION JURISDICTION BECAUSE PLAINTIFF'S CLAIMS ARISE, IF AT ALL, UNDER FEDERAL COMMON LAW

#### A.     Plaintiff's Claims Arise Under Federal Common Law Because They Implicate Transboundary Ambient Air And Water Pollution

15.     This action is removable because Plaintiff's claims, to the extent that such claims exist, necessarily are governed by federal common law, and not state common law.  28 U.S.C. § 1331

grants federal courts original jurisdiction over "'claims founded upon federal common law as well as those of a statutory origin.'" *Nat'l Farmers Union*, 471 U.S. at 850 (quoting *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972) ("*Milwaukee I*")).  As the Ninth Circuit explained in holding that similar claims for injuries caused by global warming were governed by federal common law, even "[p]ost-*Erie*, federal common law includes the general subject of environmental law and specifically includes ambient or interstate air or water pollution." *Kivalina*, 696 F.3d at 855.  Indeed, two district courts adjudicating similar claims have held that federal common law governs.  *See California v. BP p.l.c.*, 2018 WL 1064293 (N.D. Cal. Feb. 27, 2018); *City of New York v. BP p.l.c.*, 325 F. Supp. 3d 466 (S.D.N.Y. 2018).  Because Plaintiff's claims arise under federal common law, this Court has federal-question jurisdiction and removal is proper.

16.     Though "[t]here is no federal *general* common law," *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (emphasis added), federal common law continues to exist, and to govern, in a few subject areas in which there are "uniquely federal interests," *Boyle*, 487 U.S. at 504.  *See generally* Henry J. Friendly, *In Praise of* Erie—*and the New Federal Common Law*, 39 N.Y.U. L. Rev. 383 (1964).  Such uniquely federal interests will require the application of federal common law where, for example, the issue is one that by its nature falls "'within national legislative power'" and presents "a demonstrated need for a federal rule of decision" with respect to that issue. *AEP*, 564 U.S. at 421 (citation omitted).  Federal common law therefore applies, in the post-*Erie* era, in those discrete areas in which application of state law would be inappropriate and would contravene federal interests.  *Boyle*, 487 U.S. at 504–07.  The decision that federal common law applies to a particular issue thus inherently reflects a determination that state law does *not* apply.  *Nat'l Audubon Soc'y v. Dep't of Water*, 869 F.2d 1196, 1204 (9th Cir. 1988); *see also City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 312 n.7 (1981) ("*Milwaukee II*") ("[I]f federal common law exists, it is because state law cannot be used.").

17.     In *Kivalina*, the Ninth Circuit, quoting the Supreme Court's decision in *AEP*, reiterated that federal common law applies to "'subjects within the national legislative power where Congress has so directed or where the basic scheme of the Constitution so demands.'"  696 F.3d at 855 (quoting *AEP*, 564 U.S. at 421) (further citation and internal quotation marks omitted).  Although

Congress thus sometimes affirmatively directs the application of federal common law, the *Kivalina* court noted that, "[m]ore often, federal common law develops when courts must consider *federal* questions that are not answered by statutes." *Id*. (emphasis added).  Given that claims asserting injuries from global warming have an intrinsic interstate and transnational character, the Ninth Circuit held that such claims inherently raise federal questions and fall within the settled rule that federal common law governs "the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id.* at 855; *see also id.* ("federal common law can apply to trans-boundary pollution suits" such as the plaintiff's); *AEP*, 564 U.S. at 421 ("Environmental protection is undoubtedly an area within national legislative power, [and] one in which federal courts may fill in statutory interstices.").  Thus, while the Ninth Circuit had previously expressed skepticism that federal common law, as opposed to state law, would govern a *localized* claim for air pollution arising from a specific source within a single state, *see Nat'l Audubon Soc'y*, 869 F.2d at 1203–04, the court in *Kivalina* found that claims arising from injuries allegedly caused by *global* warming implicate interstate and, indeed, international aspects that inherently invoke uniquely federal interests and responsibilities.  *See Kivalina*, 696 F.3d at 856–57; *see also Massachusetts v. EPA*, 549 U.S. 497, 498 (2007) ("The sovereign prerogatives to force reductions in greenhouse gas emissions, to negotiate emissions treaties with developing countries, and (in some circumstances) to exercise the police power to reduce motor-vehicle emissions are now lodged in the Federal Government."); *United States v. Solvents Recovery Serv.*, 496 F. Supp. 1127, 1134 (D. Conn. 1980) (describing Supreme Court jurisprudence recognizing "the strong federal interest in controlling certain types of pollution and protecting the environment").

18.     Although *Kivalina* did not expressly address the viability of the plaintiff's purported alternative common law claims resting on state law (which the district court dismissed without prejudice), the *Kivalina* court's finding that federal common law applied to the municipality's global warming claims means that state law *cannot* be applied to such claims.  The conclusion that federal common law governs an issue rests not on a discretionary choice between federal law and state law, but on a determination that the issue is so distinctively federal in nature that application of state law would risk impairing uniquely federal interests.  *Boyle*, 487 U.S. at 506–07; *see also BP*, 2018 WL

1064293, at *3 ("Taking the complaints at face value, the scope of the worldwide predicament de-mands the most comprehensive view available, which in our American court system means our fed-eral courts and our federal common law.  A patchwork of fifty different answers to the same funda-mental global issue would be unworkable."); *Caltex Plastics, Inc. v. Lockheed Martin Corp*., 824 F.3d 1156, 1159–60 (9th Cir. 2016) (liability of defense contractor to third party under government contract for weapons systems implicated "uniquely federal interests" in national security that would be impaired if disparate state-law rules were applied); *Nat'l Audubon Soc'y*, 869 F.3d at 1204 ("[I]t is inconsistent to argue 'that both federal and state nuisance law apply to this case.  If state law can be applied, there is no need for federal common law; if federal common law exists, *it is because state law cannot be used*.'") (emphasis added).

19.     Accordingly, the Ninth Circuit's holding in *Kivalina* that federal common law governs global warming-related tort claims such as Plaintiff's here necessarily means that state law cannot govern such claims.  Although Plaintiff purports to style its nuisance and other common law claims as arising under state law, the question whether a particular common law claim is controlled by fed-eral common law rather than state law is itself a question of law that is governed by federal law as set forth in *Erie* and its progeny.  While Plaintiff contends that its claims arise under California law, the question of which state, if any, may apply its law to address global climate-change issues is a ques-tion that is itself a matter of federal law, given the paramount federal interest in avoiding conflicts of law in connection with ambient air and water.  Moreover, the law is well settled that, in determining whether a case arises under federal law and is properly removable, the Plaintiff's proffered position on a question of law is not entitled to any deference but is instead subject to independent and *de novo* review by the court.  *See, e.g.*, *United States v. California*, 932 F.2d 1346, 1349 (9th Cir. 1991) ("The issue of whether state or federal [common] law governs is a question of law and is reviewable de novo.");  *Flagstaff Med. Ctr., Inc. v. Sullivan*, 962 F.2d 879, 884, 889–91 (9th Cir. 1992) (same); *see also Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1086–87 (9th Cir. 2009) (applying de novo review to removal based on federal common law).

20.     The extent to which the global warming-related tort claims in this case and in *Kivalina* would impair uniquely federal interests is confirmed by comparing these inherently interstate and

Gibson, Dunn &
Crutcher LLP

transnational claims to the more localized pollution claims that the Ninth Circuit in *National Audubon* held were governed by state law.  In *National Audubon*, the claims at issue involved a challenge to the Los Angeles Department of Water and Power's diversion of "four freshwater streams that would otherwise flow into Mono Lake."  869 F.2d at 1198.  This discrete conduct in California allegedly exposed part of Mono Lake's lake bed, increased the lake's "salinity and ion concentration," and led to "air pollution in the form of alkali dust storms from the newly exposed lake bed."  *Id*. at 1198–99.  The Ninth Circuit held that the allegation that some of the dust reached Nevada was not enough to show that the case involved the sort of "interstate dispute previously recognized as requiring resolution under federal law," such that it was "'inappropriate for state law to control.'"  *Id*. at 1204.  Given their essentially localized nature, the claims involved only a "domestic dispute" that did not fit within the interstate paradigms that the Supreme Court had to that point recognized as properly governed by federal common law.  *Id*. at 1205; *cf. Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 497–98 (1987) (holding that New York law applied to pollution claims arising from discharges from a lakeside New York business, even though those effluents flowed to Vermont side of the lake and caused injury there).

21.    In light of the federal nature of the issues raised by global warming, as described in *AEP* and in *Massachusetts v. EPA*, the *Kivalina* court correctly reached a different conclusion with respect to global warming-related tort claims such as those presented here.  Because (as Plaintiff concedes, Compl. ¶ 68) global warming occurs only as a result of the undifferentiated accumulated emissions of all emitters in the world over an extended period of time, any judgment as to the reasonableness of particular emissions, or as to their causal contribution to the overall phenomenon of global warming, inherently requires an evaluation at an interstate and, indeed, transnational level.  Thus, even assuming that state tort law may properly address local source emissions within that specific state, the imposition of tort liability for allegedly unreasonably contributing to *global* warming would require an over-arching consideration of *all* of the emissions traceable to sales of Defendants' products in each of the states, and, in fact, in the more than 180 nations of the world.  Given the Federal Government's exclusive authority over foreign affairs and foreign commerce, and its preeminent authority over interstate commerce, tort claims concerning global warming directly implicate uniquely

federal interests, and a patchwork of 50 states' common law rules cannot properly be applied to such claims without impairing those interests.  Indeed, the Supreme Court expressly held in *AEP* that in cases like this, "borrowing the law of a particular State would be inappropriate."  564 U.S. at 422.  Such global warming-related tort claims, to the extent they exist, are therefore governed by federal common law.  *Kivalina*, 696 F.3d at 855–56.

22.     Under the principles set forth above, Plaintiff's claims are governed by federal common law.  The gravamen of Plaintiff's claims is that "production and use of Defendants' fossil fuel products plays a direct and substantial role in the unprecedented rise in emissions of greenhouse gas pollution" which "is the main driver of the gravely dangerous changes occurring to the global climate."  Compl. ¶ 3; *see, e.g.*, *id.* ¶¶ 53–54, 195, 209.  Plaintiff's Complaint alleges that Defendants are responsible for "more than one in every five tons of carbon dioxide and methane emitted worldwide," *id.* ¶ 21, and that "[a]nthropogenic (human-caused) greenhouse gas pollution, primarily in the form of $CO_2$, is far and away the dominant cause of global warming and the observed increase in ocean temperatures, including marine heatwaves," *id.* ¶ 4; *see also id.* ¶¶ 48, 51, 69–70.  As is evident from the term "global warming" itself, both the causes and the injuries Plaintiff identifies are not constrained to particular sources, cities, counties, or even states, but rather implicate inherently national and international interests, including treaty obligations and federal and international regulatory schemes.  *See id.* ¶ 4 n.4 (describing other sources of emissions); *id.* ¶ 52 (same); *id.* ¶ 14 (only approximately "15% of total [$CO_2$] emissions" allegedly caused by Defendants); *id.* ¶ 84 (discussing "impact of Defendants' fossil fuel products on the environment, including *global* surface and ocean warming") (emphasis added); *see, e.g.*, *Massachusetts*, 549 U.S. at 509, 523–24 (describing Senate rejection of the Kyoto Protocol because emissions-reduction targets did not apply to "heavily polluting nations such as China and India," and EPA's determination that predicted magnitude of future Chinese and Indian emissions "offset any marginal domestic decrease"); *AEP*, 564 U.S. at 427–29 (describing regulatory scheme of the Clean Air Act and role of the EPA); *see also* The White House, Statement by President Trump on the Paris Climate Accord (June 1, 2017), https://www.whitehouse.gov/the-press-office/2017/06/01/statement-president-trump-paris-climate-accord (announcing United States withdrawal from Paris Climate Accord based on financial burdens,

energy restrictions, and failure to impose proportionate restrictions on Chinese emissions).  And Plaintiff alleges that its alleged injuries have been sustained in navigable waters—a proper locus of federal common law.  *See Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 771–72 (7th Cir. 2011) (finding that a claim that the Army Corps of Engineers facilitated migration of an invasive fish species through navigable links in the Chicago Area Water System was governed by the federal common law of public nuisance).

23.     Indeed, the Complaint itself demonstrates that the unbounded nature of greenhouse gas emissions, diversity of sources, and magnitude of the attendant consequences have catalyzed myriad federal and international efforts to understand and address such emissions.  *See, e.g.*, Compl. ¶ 115.  The paramount federal interest in addressing the worldwide effect of greenhouse gas emissions is manifested in the regulatory scheme set forth in the Clean Air Act as construed in *Massachusetts v. EPA*.  *See AEP*, 564 U.S. at 427–29.  Federal legislation regarding greenhouse gas emissions reflects the understanding that "[t]he appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum:  as with other questions of national or international policy, informed assessment of competing interests is required.  Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance."  *Id.* at 427.  As a "question[] of national or international policy," the question of how to address greenhouse gas emissions that underlies the requested relief at the heart of Plaintiff's claims implicates inherently federal concerns and is therefore governed by federal common law.  *See id.*; *see also Milwaukee II*, 451 U.S. at 312 n.7 ("[I]f federal common law exists, it is because state law cannot be used.").  Because common law claims that rest on injuries allegedly caused by global warming implicate uniquely federal interests, such claims (to the extent they exist at all) must necessarily be governed by federal common law.

**B.     Plaintiff's Claims Arise Under Federal Common Law Because They Implicate The Management Of A Federal Resource**

24.     This Court also has original jurisdiction under 28 U.S.C. § 1331 because Plaintiff seeks to hold Defendants liable for alleged injuries to Dungeness crabs that Plaintiff's members harvest from the Outer Continental Shelf.

25.     Under federal law, Dungeness crabs are classified as a sedentary species, *i.e.*, living organisms either affixed to the seabed or unable to move except in constant contact with the seabed. *See* 16 U.S.C. 1802(7) (listing Dungeness crabs as a "sedentary species" within the definition of "Continental Shelf fishery resources").

26.     Although Plaintiff's complaint does not specify the precise locations where its members harvest Dungeness crabs, the Pacific-coast Dungeness crab fisheries are predominantly on the Outer Continental Shelf, *i.e.*, the undersea lands more than 3 nautical miles from the shore.  A report available on the website of the California Ocean Protection Council explains that "[t]he west coast Dungeness crab fishery is conducted in both state (0–3 nautical miles from shore) and federal (3–200 nautical miles) waters of Oregon, Washington and California" and that "[m]ost fishing is conducted within 50 miles (80 kilometers) from shore." *See* California Ocean Protection Council, *Dungeness Crab (Metacarcinus magister)*, http://opc.ca.gov/webmaster/ftp/project_pages/Rapid%20Assessments/Dungeness%20Crab.pdf.  The State of Oregon, accordingly, recognizes that the Dungeness crab fishery off its coast extends into federal waters.  *See* OAR 635-005-0460.

27.     The government of the United States has exclusive jurisdiction over the seabed of the Outer Continental Shelf and its natural resources, including Dungeness crabs.  The Submerged Lands Act ("SLA") notes that "[n]othing in [the SLA] shall be deemed to affect in any wise the rights of the United States to the natural resources of that portion of the subsoil and seabed of the Continental Shelf . . . , all of which natural resources appertain to the United States, and the jurisdiction and control of which by the United States is confirmed." 43 U.S.C. § 1302.  And that Act expressly defines "natural resources" to include "crabs." *See* 43 U.S.C. § 1301.  In the Outer Continental Shelf Lands Act, enacted less than a year after the SLA, Congress reaffirmed the exclusive jurisdiction of the United States over the subsoil, seabed, and resources of the OCS.  *See* 43 U.S.C. § 1333(a)(1) ("The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the

same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State.").

28.     Because federal law provides that Dungeness crabs are a natural resource subject to exclusive federal jurisdiction, claims alleging harms to that federal resource must be governed by federal common law.  Accordingly, Plaintiff's tort claims arise under federal common law and are removable under 28 U.S.C. §§ 1331 and 1441.

**IV.     THE ACTION IS REMOVABLE BECAUSE IT RAISES DISPUTED AND SUBSTANTIAL FEDERAL ISSUES.**

29.     "Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed . . . to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  Federal district courts, in turn, "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  The Supreme Court has held that suits apparently alleging only state-law causes of action nevertheless "arise under" federal law if the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."  *Grable*, 545 U.S. at 314.  Applying this test "calls for a common-sense accommodation of judgment to the kaleidoscopic situations that present a federal issue."  *Id.* at 313.

30.     Plaintiff's Complaint attempts to undermine and supplant federal regulation of greenhouse gas emissions and hold a national industry responsible for the increasing atmospheric and oceanic temperatures, marine heatwaves, and algal blooms that are allegedly caused by global climate change.  There is no question that Plaintiff's claims raise a "federal issue, actually disputed and substantial," for which federal jurisdiction would not upset "any congressionally approved balance of federal and state judicial responsibilities."

31.     The issues of greenhouse gas emissions, global warming, and rising ocean temperatures are not unique to California, or even the United States.  Yet the Complaint attempts to supplant

decades of national energy, economic development, and federal environmental protection and regula-tory policies by prompting a California state court to take control over an entire industry and its inter-state commercial activities, and impose massive damages contrary to the federal regulatory scheme.

32.    Collectively as well as individually, Plaintiff's causes of action depend on the resolu-tion of disputed and substantial federal questions in light of complex national considerations.  Indeed, "the scope and limitations of a complex federal regulatory framework are at stake in this case.  And disposition of whether that framework may give rise to state law claims as an initial matter will ulti-mately have implications for the federal docket one way or the other."  *Bd. of Comm'rs of Se. La. Flood Protection Auth. v. Tenn. Gas Pipeline Co*, 850 F.3d 714, 723 (5th Cir. 2017) ("*Flood Protec-tion Authority*").

33.    For example, Plaintiff's first cause of action asserts a claim for nuisance.  Under Cali-fornia law, were it to apply, nuisance claims require a plaintiff to prove that the defendant's conduct is "unreasonable":  in other words, "the gravity of the harm [must] outweigh[] the social utility of the defendant's conduct."  *San Diego Gas & Elec. Co. v. Superior Ct.*, 13 Cal. 4th 893, 938 (1996). Plaintiff alleges that Defendants, through their national and, indeed, global activities have "created a condition and permitted that condition to persist, which constitutes a nuisance in the form of in-creased mean sea surface temperature and intense marine heatwaves, which caused recurring *Pseudo-nitzschia* algal blooms unprecedented in their range and toxicity, which caused and will continue to cause domoic acid to contaminate Dungeness crabs at potentially dangerous concentrations."  Compl. ¶ 180.  Plaintiff alleges that "[t]he seriousness of the harm to Plaintiff outweighs the public benefit of Defendants' and each of their conduct."  *Id.* ¶ 183.  Plaintiff's product liability claims require a simi-lar risk-utility balancing.  *See Barker v. Lull Eng'g Co., Inc.*, 20 Cal. 3d 413, 427 (1978).

34.    But under federal law, federal agencies must "assess both the costs and benefits of [an] intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation jus-tify its costs."  Executive Order 12866, 58 Fed. Reg. 190.  In fact, Congress has directed a number of federal agencies to regulate Defendants' conduct, and in doing so to conduct the same analysis of benefits and impacts that Plaintiff would have the state court undertake in analyzing Plaintiff's

claims.  And federal agencies have performed these cost-benefit analyses.  *See, e.g.*, Emission Guide-lines for Greenhouse Gas Emissions From Existing Electric Utility Generating Units; Revisions to Emission Guideline Implementing Regulations; Revisions to New Source Review Program; Proposed rule, 83 Fed. Reg. 44,746, 44,792 (considering the benefits and costs related to EPA's proposed Affordable Clean Energy Rule, and noting that "[i]n the decision-making process it is useful to consider the change in benefits due to the targeted pollutant relative to the costs"); *id.* at 44,793–95 (comparing the benefits of the proposal with respect to targeted pollutants with compliance costs); Final Carbon Pollution Standards for New, Modified, and Reconstructed Power Plants, 80 Fed. Reg. 64685 (EPA noting that "'[t]he chemistry of the ocean is changing at an unprecedented rate and magnitude due to anthropogenic carbon dioxide emissions'" and that "the risks 'threaten coral reefs, fisheries, protected species, and other natural resources of value to society").  The benefits and harms of Defendants' conduct are broadly distributed throughout the Nation, to all residents as well as all state and government entities.  Given this diffuse and broad impact, Congress has acted through a variety of federal statutes—primarily but not exclusively, the Clean Air Act—to strike the balance between energy extraction and production and environmental protections.  *See* Clean Air Act, 42 U.S.C. § 7401(c) (Congressional statement that the goal of the Clean Air Act is "to encourage or otherwise promote reasonable Federal, State, and local governmental actions . . . for pollution prevention"); *see also, e.g.*, Energy Reorganization Act of 1974, 42 U.S.C. § 5801 (Congressional purpose to "develop, and increase the efficiency and reliability of use of, all energy sources" while "restoring, protecting, and enhancing environmental quality"); Mining and Minerals Policy Act, 30 U.S.C. § 1201 (Congressional purpose to encourage "economic development of domestic mineral resources" balanced with "environmental needs"); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201 (Congressional findings that coal mining operations are "essential to the national interest" but must be balanced by "cooperative effort[s] . . . to prevent or mitigate adverse environmental effects"); Outer Continental Shelf Lands Act, 43 U.S.C. § 1346 (requiring the Secretary of the Interior to study and consider impacts on human, marine, and coastal environments of the Outer Continental Shelf and coastal areas which may be affected by oil and gas or other mineral development).

Gibson, Dunn & Crutcher LLP

35.     The question whether the federal agencies charged by Congress to balance energy and environmental needs for the entire Nation have struck that balance in an appropriate way is "inherently federal in character" and gives rise to federal question jurisdiction. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347(2001); *see also Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (affirming federal question jurisdiction where claims implicated federal agency's acts implementing federal law); *Bennett v. Southwest Airlines Co.*, 484 F.3d 907, 909 (7th Cir. 2007) (federal removal under *Grable* appropriate where claims were "a collateral attack on the validity of" agency action under a highly reticulated regulatory scheme).  Adjudicating these claims in federal court, including whether private rights of action are even cognizable, is appropriate because the relief sought by Plaintiff would necessarily alter the regulatory regime designed by Congress, impacting residents of the Nation far outside the state court's jurisdiction. *See, e.g.*, *Grable*, 545 U.S. at 312 (claims that turn on substantial federal questions "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues"); *West Virginia ex rel. McGraw v. Eli Lilly & Co.*, 476 F. Supp. 2d 230, 234 (E.D.N.Y. 2007) (removal under *Grable* is appropriate where state common law claims implicate "an intricate federal regulatory scheme . . . requiring some degree of national uniformity in interpretation").

36.     The Complaint also calls into question Federal Government decisions to contract with Defendants for the extraction, development, and sale of fossil fuel resources on federal lands.  Such national policy decisions have expanded fossil fuel production and use, and produced billions of dollars in revenue to the federal treasury.  Available, affordable energy is fundamental to economic growth and prosperity generally, as well as to national security and other issues that have long been the domain of the Federal Government.  Yet, Plaintiff's claims require a determination that the complained-of conduct—the lawful activity of placing fossil fuels into the stream of interstate and foreign commerce—is unreasonable, and that determination raises a policy question that, under the Constitution and applicable statutes, treaties, and regulations, is a federal question. *See In re Nat'l Sec. Agency Telecommc'ns*, 483 F. Supp. 2d 934, 943 (N.D. Cal. 2007) (holding that removal jurisdiction existed over case that implicated state-secrets privilege because "the privilege is 'not only a contested

federal issue, but a substantial one,' for which there is 'a serious federal interest in claiming the advantages thought to be inherent in a federal forum'" (quoting *Grable*, 545 U.S. at 313)).  The cost-benefit analysis required by the claims asserted in the Complaint would thus necessarily entail a usurpation by the state court of the federal regulatory structure of an essential, national industry.  "The validity of [Plaintiff's] claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law." *Flood Control Authority*, 850 F.3d at 724; *see also Bader Farms, Inc. v. Monsanto Co.*, No. 16-cv-299, 2017 WL 633815, at *3 (E.D. Mo. Feb. 16, 2017) ("Count VII is in a way a collateral attack on the validity of APHIS's decision to deregulate the new seeds"); *Bennett*, 484 F.3d at 909 (holding that federal removal is proper under *Grable* "when the state proceeding amounted to a collateral attack on a federal agency's action").  Indeed, the "inevitable result of such suits," if successful, is that Defendants "would have to change [their] methods of doing business and controlling pollution to avoid the threat of ongoing liability." *Ouellette*, 479 U.S. at 495.

37.     Plaintiff's claims also necessarily implicate substantial federal questions by seeking to hold Defendants liable for compensatory and punitive damages, as well as injunctive relief, based on allegations that Defendants have waged a "campaign to obscure the science of climate change" (Compl. ¶ 151), and of "disinformation . . . [that] prevented customers, consumers, regulators, and the general public from taking steps to mitigate the inevitable consequences of fossil fuel consumption" (*id.* ¶ 211(c)), thereby "delay[ing] efforts to curb these emissions" (*id.* ¶ 151; *see also id.* ¶¶ 112–42).

38.     To show causation, Plaintiff must establish that federal regulators were misled *and* would have adopted different energy and climate policies absent the alleged misrepresentations.  Such a liability determination would require a court to construe federal regulatory decision-making standards and determine how federal regulators would have applied those standards under counterfactual circumstances.  *See id.* ¶ 132 (alleging that GCC "on behalf of Defendants" sought to "prevent[] U.S. adoption of the Kyoto Protocol"); *see also Flood Protection Authority*, 850 F.3d at 723 (finding

necessary and disputed federal issue in plaintiffs' state-law tort claims because they could not "be resolved without a determination whether multiple federal statutes create a duty of care that does not otherwise exist under state law").

39.     Plaintiff's Complaint, which seeks to hold Defendants liable for "punitive and exemplary damages" and requests "equitable disgorgement of **all profits** Defendants obtained" through their business of manufacturing, producing, and/or promoting the sale of fossil fuel products (Compl. ¶ 185 (emphasis added))—despite Defendants' uncontested compliance with state and federal law—necessarily implicates numerous other disputed and substantial federal issues.  Beyond the strictly jurisdictional character of the points addressed above and herein, it is notable that this litigation places at issue multiple significant federal issues, including but not limited to:  (1) whether Defendants can be held liable consistent with the First Amendment for purportedly "championing . . . anti-regulation and anti-science campaigns" that Plaintiff alleges deceived federal agencies (*id*. ¶ 15); (2) whether a state court may hold Defendants liable for conduct that was global in scale (production of fossil fuels), that allegedly produced effects that are global in scale (increased $CO_2$ levels and rising atmospheric and ocean temperatures), and on that basis, order Defendants to modify their conduct on a global scale (abating these consequences of global climate change), consistent with the constitutional principles limiting the jurisdictional and geographic reach of state law and guaranteeing due process; (3) whether fossil fuel *producers* may be held liable, consistent with the Due Process Clause, for climate change when it is the combustion of fossil fuels—including by Plaintiff—that leads to the release of greenhouse gases into the atmosphere; (4) whether a state may impose liability under state common law when the Supreme Court has held that the very same *federal* common law claims are displaced by federal statute, and notwithstanding the commonsense principle that "[i]f a federal common law cause of action has been extinguished by Congressional displacement, it would be incongruous to allow it to be revived *in any form*," *Kivalina*, 696 F.3d at 857 (emphasis added); (5) whether a state court may regulate and burden on a global scale the sale and use of what federal policy has deemed an essential resource, consistent with the United States Constitution's Commerce Clause and foreign affairs doctrine, as well as other constitutional principles; and (6) whether a state court may

review and assess the validity of acts of foreign states in enacting and enforcing their own regulatory frameworks.

40.     Additionally, Plaintiff's claims regarding conditions in the Dungeness crab fisheries, which are located in federal waters, are necessarily premised on the notion that the existing comprehensive statutory and regulatory framework for fisheries management and relief for commercial fishery disasters provides inadequate protection.  In this action, Plaintiff seeks damages to compensate for economic losses flowing from fishery closures and lost economic opportunities related to demoic acid contamination.  *See* Compl. ¶ 11.  But as Plaintiff concedes in its Complaint, the federal government has already exercised authority under federal statutes to address this very issue by declaring a fishery resource disaster under the Magnuson-Stevenson Fishery Management and Conservation Act (MSA), 16 U.S.C. § 4107, and the Interjurisdictional Fisheries Act, 16 U.S.C. §§ 1861a, 1864.  *See id.* ("The severity of the economic loss endured by the crabbing community prompted the federal government to declare the 2015–16 California crab season a federal fishery disaster under the Magnuson-Stevens Fishery Management and Conservation Act.").  By declaring a fishery disaster, "the Secretary [of Commerce] is authorized to make sums available to be used . . . for assessing the economic and social effects of the commercial fishery failure, or any activity that the Secretary determines is appropriate *to restore the fishery or prevent a similar failure in the future*."  16 U.S.C. § 1861a(a)(2) (emphasis added).  Here, Congress in fact appropriated over $25 million in disaster relief funding for the California Dungeness Crab and Rock Crab fishery in response to a request by the Governor of California for a federal fishery disaster determination as a result of "harmful algal bloom" that caused the closure of Dungeness crab fisheries in 2015-16.  See Public Law 115-123 (Feb. 9, 2018); Letter from Gov. Edmund G. Brown, Jr. to Hon. Penny Pritzker (Feb. 9, 2016), https://www.fisheries.noaa.gov/webdam/download/65032821.  The Secretary of Commerce has expressly stated her intent to "work[] with the State of California to develop a spend plan" for distribution of these funds, in collaboration with local stakeholders, that "will create a more resilient fishery that can better withstand similar environmental disasters in the future."  *See* Letter from Penny Pritzker, Sec. of Commerce, to the Honorable Edmund G. Brown, Governor of California (Jan. 18, 2017), https://www.fisheries.noaa.gov/webdam/download/65032827; *see also* Letter from Penny Pritzker,

Sec. of Commerce, to Charles Woodruff, Chairman, Quileute Tribal Council (Jan. 18, 2017), file:///C:/Users/20434/Downloads/69_dungeness_determination_NOAA-SF.pdf (making similar disaster relief determination at the request of the Quileute Tribe for the Washington Dungeness Crab Fishery).  Plaintiff, however, seeks to use California common law to second-guess the Secretary's determinations regarding the reasonable and cost-justified steps that are necessary to restore the Dungeness crab fisheries and protect them against future harms.

41.     Plaintiff's claims raise a substantial federal issue in that they implicate the management framework for Dungeness crab fisheries that has been established under federal law.  *See Bd. of Comm'rs of the Se. La. Flood Prot. Auth.-E v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 724 (5th Cir. 2017).  California, Washington, and Oregon regulate Dungeness crab fisheries in the exclusive economic zone adjacent to the State under delegation from Congress.  *See*  Pub. L. 105–384, Sec. 203 (Nov. 13, 1998); Pub. L. 115-49, 131 Stat. 1000 (Aug. 18, 2017).  The states' management authority is not only created by a federal delegation but is subject to federal oversight and will be extinguished with the development of a fishery management plan for the fishery under the MSA.  *Id.*  Further, under the framework set up by federal law, NOAA's Office of Law Enforcement enforces fishing regulations and provides scientific and administrative support for the management of fisheries in federal waters.  *See, e.g.*, 16 U.S.C. § 1861.  Plaintiff's action calls into question the adequacy of this framework to manage and protect Dungeness crab fisheries in California and elsewhere, thus requiring the Court to evaluate its sufficiency to redress the harms alleged in the Complaint.  And even though the federal government is not (at least so far) a party to this case, because the "[federal] [g]overnment also has a 'direct interest in the availability of a federal forum to vindicate its own administrative action,'" this action raises "'an important issue of federal law that sensibly belongs in a federal court.'" *Hornish v. King Cty.*, 899 F.3d 680, 691 (9th Cir. 2018) (quoting *Grable*, 545 U.S. at 315).

42.     Plaintiff's Complaint also raises substantial federal issues because the asserted claims intrude upon both foreign policy and carefully balanced regulatory considerations at the national level, including the foreign affairs doctrine.  Plaintiff seeks to govern extraterritorial conduct and encroach on the foreign policy prerogative of the Federal Government's executive branch as to climate change treaties.  "There is, of course, no question that at some point an exercise of state power that

Gibson, Dunn &
Crutcher LLP

touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place." *Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396, 413 (2003). Yet, this is the precise nature of Plaintiff's action brought in state court. *See United States v. Belmont*, 301 U.S. 324, 331 (1937) ("The external powers of the United States are to be exercised without regard to state laws or policies . . . . [I]n respect of our foreign relations generally, state lines disappear."); *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government . . . requires that federal power in the field affecting foreign relations be left entirely free from local interference."). Indeed, Plaintiff's complaint takes issue with multiple federal decisions, threatening to upend the federal government's longstanding energy and environmental policies and "compromis[ing] the very capacity of the President to speak for the Nation with one voice in dealing with other governments" on the issue of climate change. *Garamendi*, 539 U.S. at 424.

43.     Through its action, Plaintiff seeks to regulate greenhouse gas emissions worldwide, far beyond the borders of the United States. This is premised in part, according to Plaintiff, on Defendants' purported campaign to undermine national and international efforts, like the Kyoto Protocol, to rein in greenhouse gas emissions. Compl. ¶¶ 7, 116, 132. Plaintiff alleges that its injuries are caused by global weather phenomena, such as increases in the Earth's ambient air and ocean temperatures, and that Defendants are a substantial contributing factor to such climate change as a result of their collective operations on a worldwide basis, which Plaintiff claims accounts for "more than 15% of global fossil fuel product-related $CO_2$" emissions between 1965 and 2015. *Id*. ¶ 69. But "[n]o State can rewrite our foreign policy to conform to its own domestic policies. Power over external affairs is not shared by the States; it is vested in the national government exclusively. It need not be so exercised as to conform to State laws or State policies, whether they be expressed in constitutions, statutes, or judicial decrees." *United States v. Pink*, 315 U.S. 203, 233–34 (1942). States have no authority to impose remedial schemes or regulations to address what are matters of foreign affairs. *Gingery v. City of Glendale*, 831 F.3d 1222, 1228–29 (9th Cir. 2016) ("It is well established that the federal government holds the exclusive authority to administer foreign affairs."). Yet Plaintiff's Complaint seeks to replace international negotiations and Congressional and Executive decisions with

1   their own preferred foreign policy, using the ill-suited tools of California common law and private

2   litigation.  Even when *states* (as opposed to an industry group, as here) have made similar efforts, en-

3   acting laws seeking to supplant or supplement foreign policy, the Supreme Court has held that state

4   law can play no such role.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375–81 (2000);

5   *Garamendi*, 539 U.S. at 420–24.

6   **V.      THE ACTION IS REMOVABLE UNDER FEDERAL COURTS' ADMIRALTY JU-**

7   **RISDICTION**

8           44.      Plaintiff's claims are also removable because they fall within the Court's admiralty

9   jurisdiction.  The Constitution extends the federal judicial power "to all Cases of admiralty and mari-

10  time Jurisdiction," U.S. Const. Art. III, § 2, and "Congress has embodied that power in a statute giv-

11  ing federal district courts 'original jurisdiction [over] . . . [a]ny civil case of admiralty or maritime ju-

12  risdiction," *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531 (1995)

13  (quoting 28 U.S.C. § 1333) (alterations in original).

14          45.      The Supreme Court held in *Grubart* that "[a] party seeking to invoke federal admiralty

15  jurisdiction . . . must satisfy conditions both of location and of connection with maritime activity."

16  *Grubart*, 513 U.S. at 534.  "A court applying the location test must determine whether the tort oc-

17  curred on navigable water or whether injury suffered on land was caused by a vessel on navigable

18  water."  *Id.*  The connection test comprises two distinct questions.  First, a court "must 'assess the

19  general features of the type of incident involved' to determine whether the incident has 'a potentially

20  disruptive impact on maritime commerce.'"  *Id.*  "Second, a court must determine whether 'the gen-

21  eral character' of the 'activity giving rise to the incident' shows a 'substantial relationship to tradi-

22  tional maritime activity.'"  *Id.*

23          46.      Plaintiff's claims satisfy the location test because "the tort occurred on navigable wa-

24  ter."  Plaintiff asserts "claims arising from domoic acid impacts on [Dungeness] crab fisher[ies]" in

25  the Pacific Ocean.  Compl. ¶ 16.  These impacts allegedly result from "marine heatwaves along the

26  United States' west coast," which have purportedly "created the ideal conditions for the toxic algal

27  group *Pseudo-nitzschia* to increase in abundance and invade the marine regions that correspond with

28  some of the most productive Dungeness crab fishery grounds."  *Id.* ¶ 8.  All of these effects, and

Plaintiff's injuries arising therefrom, occur in navigable waters.  *See In re Mission Bay Jet Sports, LLC*, 570 F.3d 1124, 1127 (9th Cir. 2009) ("Nor is there a serious question that Mission Bay, including the reserved area where the accident in this case occurred, is a body of navigable water because it is open to the Pacific Ocean and is subject to the ebb and flow of tides.").

47.     Beyond that, Plaintiffs allege that the tort arises from production of fossil fuels, including worldwide extraction.  A significant portion of this extraction takes place on mobile offshore drilling units that operate in navigable waters.  *See In re Oil Spill by the oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, 808 F. Supp. 2d 943, 949 (E.D. La. 2011).  For example, Chevron's "Jack and St. Malo fields were co-developed with subsea completions flowing back to a single host floating production unit (semisubmersible) located between the fields."  http://www.chevron.com/projects/jack-stmalo.  The other Defendants' subsidiaries' similarly operate floating drilling platforms at various locations around the world.  *See, e.g.*, *Atlantis Field: Fact Sheet* 1, https://www.bp.com/content/dam/bp-country/en_us/PDF/Atlantis_Fact_Sheet_6_14_2013.pdf (BP); Offshore Technology, *Magnolia Deepwater Oil and Gas Field, Gulf of Mexico*, http://www.offshore-technology.com/projects/magnolia/ (ConocoPhillips); *Safety and Security*, http://corporate.exxonmobil.com/en/community/corporate-citizenship-report/safety-and-health-and-the-workplace/safety-and-security (ExxonMobil); *Auger: From Deep-Water Pioneer to New Energy Giant*, http://www.shell.com/about-us/major-projects/cardamom/auger-from-deep-water-pioneer-to-new-energy-giant.html (Shell).  "Under clearly established law," such floating drilling platforms are "vessel[s], not a fixed platform."  *In re Oil Spill*, 808 F. Supp. 2d at 949; *see also Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 215 (5th Cir. 2013) ("[J]ack-up drilling platforms . . . are considered vessels under maritime law."); *Herb's Welding v. Gray*, 470 U.S. 414, 417 n.2 (1985) ("Offshore oil rigs are of two general sorts: fixed and floating.  Floating structures have been treated as vessels by the lower courts.").  Indeed, even fixed drilling platforms are considered "vessels" while they "are underway to a drilling operation."  *Shell Offshore, Inc. v. Greenpeace, Inc.*, No. 3:12-cv-00042, 2012 WL 1931537, at *3 (D. Alaska May 29, 2012).

48.     Even to the extent Defendants' extraction does not occur on navigable waters, it still gives rise to admiralty jurisdiction because it allegedly produces harm on navigable waters.  *See East*

*River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 863–64 (1986) (finding products-liability claims "satisfy the traditional 'locality' requirement" where a 225,000-ton turbine manufactured on land produced an "injury . . . while the ships were sailing on the high seas"); *Seven Seas Fish Mkt., Inc. v. Koch Gathering Sys., Inc.*, 36 S.W.3d 683, 686 (Tex. App. 2001) ("Because the alleged injuries (i.e., a depletion of fisheries in Corpus Christi, Nueces, and Oso Bays) occurred on navigable waters, appellees satisfied the locality test.").

49.     Plaintiff's claims also satisfy both prongs of the connection test.  Indeed, under the *Grubart* test, "'virtually every activity involving a vessel on navigable waters would be a traditional maritime activity sufficient to invoke maritime jurisdiction.'" *Taghadomi v. United States*, 401 F.3d 1080, 1087 (9th Cir. 2005) (quoting *Grubart*, 513 U.S. at 542).

50.     First, "the general features of the type of incident" alleged "has a 'potentially disruptive impact on maritime commerce.'" *Grubart*, 513 U.S. at 534.  As this Court has acknowledged, "the fishing industry is clearly a part of traditional maritime activity; and to assert otherwise would amount to a repudiation of much of maritime history." *Union Oil Co. v. Oppen*, 501 F.2d 558, 561 (9th Cir. 1974); *see also Gruver v. Lesman Fisheries, Inc.*, 489 F.3d 978, 982 (9th Cir. 2007).  And Plaintiff expressly alleges that Defendants have disrupted this maritime commerce.  According to Plaintiff, global warming has caused "changes [that] threaten . . . the productivity of commercial fisheries" along the Pacific Coast (Compl. ¶ 1), and that "[a]s a precaution to avoid poisoning humans with domoic acid" caused by algal blooms resulting from climate change, California and Oregon have already severely curtailed Dungeness crab fishing for the past three seasons, with further disruptions this coming season, *id.* ¶¶ 169–70.  Plaintiff alleges that this has also affected other fisheries, as "[t]he delayed opening of the crab fishery . . . caused many fishermen, including Plaintiff, to delay their entry into other fisheries they would have normally pursued earlier, including salmon, coonstripe shrimp, albacore, and others." *Id.* ¶ 173.  This Court has held that "delay or . . . cancellation of scheduled fishing trips" can satisfy the first prong of the connection test.  *See Gruver*, 489 F.3d at 983 (finding the connection test satisfied where an assault aboard a vessel could give rise to delayed or undermanned fishing expeditions).

51.     Second, "'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'" *Grubart*, 513 U.S. at 534.  Plaintiff alleges that the emission of $CO_2$ from the combustion of fossil fuels has caused a rise in ocean temperatures and the "upwelling" of "nutrient-rich water," which has resulted in toxic *Pseudo-nitzschia* algal blooms.  Compl. ¶¶ 60–65 & n.33.  These allegations constitute a sufficiently close relationship with Plaintiff's maritime fishing activity to ground admiralty jurisdiction, as numerous other courts have held on similar facts.  For example, in *National Sea Clammers Ass'n v. City of New York*, 616 F.2d 1222 (2d Cir. 1980) (*vac'd on other grounds*), "an association whose members make their living harvesting fish and shellfish from the water and ocean beds of the Atlantic Ocean near New York and New Jersey," brought suit "alleg[ing] that defendants discharged or permitted the discharge of certain nutrient-rich sewage," which "caused a massive and rapid growth of algae." *Id.* at 1224.  This algal bloom "created an anoxia, an oxygen deficiency, in the water near the ocean's floor, which caused death and other adverse effects on marine life . . . , such as shellfish." *Id.* at 1225.  Noting that "[t]he situs of the algal bloom was the high seas," the Court held that "[t]he nexus to maritime commerce is plain," and "[t]hus, th[e] suit by plaintiffs for the tort of nuisance committed in the navigable waters and injuring those engaged in maritime commerce falls within the admiralty jurisdiction of the district court." *Id.* at 1235; *see also Union Oil*, 501 F.2d at 561 (observing in dicta that a suit by commercial fishermen for lost profits attributable to an oil spill in the Santa Barbara Channel "bears a significant relationship to traditional maritime activity"); *Conner v. Aerovox, Inc.*, 730 F.2d 835, 836, 838 (1st Cir. 1984) (noting that nuisance claims by fishermen alleging defendants discharged pollutants that "settled on the seabed and have accumulated in high concentration in shellfish," prompting the government "to restrict commercial fishing in those areas," "have recently been recognized as principles of maritime tort law").

52.     Section 1333's saving-to-suitors clause does not alter this conclusion.  *See* 28 U.S.C. § 1333 ("The district courts shall have original jurisdiction, exclusive of the courts of the States, of (1) any civil case of admiralty or maritime jurisdiction, *saving to suitors in all cases all other remedies to which they are otherwise entitled*.") (emphasis added).  Rather, that clause preserves to Plain-

tiff all *remedies* it otherwise has, while requiring it to *pursue* those remedies in a federal forum. In-deed, it would be nonsensical to confer "original" and "exclusive" jurisdiction over maritime cases to federal courts, but then to guarantee plaintiffs a state-court forum. *See Tenn. Gas. Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 153 (5th Cir. 1996) (holding that the "'saving to suitors' clause does no more than preserve the right to maritime suitors to pursue maritime *remedies*. It does not guarantee them a nonfederal *forum*."); *Lu Junhong v. Boeing Co.*, 792 F.3d 805, 818 (7th Cir. 2015); *Ryan v. Hercules Offshore, Inc*., 945 F. Supp. 2d 772, 778 (S.D. Tex. 2013) (2011 amendments to 28 U.S.C. § 1441 permit removal of maritime claims notwithstanding the savings-to-suitors clause).

53.     Because this Court has admiralty jurisdiction, removal under 28 U.S.C. § 1441 is proper.

## VI.     THE ACTION IS REMOVABLE BECAUSE IT IS COMPLETELY PREEMPTED BY FEDERAL LAW

54.     This Court also has original jurisdiction over this lawsuit because Plaintiff requests relief that would alter or amend the rules regarding nationwide—and even worldwide—regulation of greenhouse gas emissions. This action is completely preempted by federal law.

55.     The Supreme Court has held that a federal court will have jurisdiction over an action alleging only state-law claims where "the extraordinary pre-emptive power [of federal law] converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987).

56.     For the reasons set forth above, litigating in state court the inherently transnational activity challenged by these complaints would inevitably intrude on the foreign affairs power of the federal government and is completely preempted. *See Garamendi*, 539 U.S. at 418 ("[S]tate action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state [action], and hence without any showing of conflict."); *see also California v. Gen. Motors Corp.,* 2007 WL 2726871,*14 (N.D. Cal. Sept. 17, 2007) (dismissing claims against automakers because the federal government "ha[s] made foreign policy determinations regarding the United States' role in the international concern about global warming," and a "global warming nuisance tort would have an inextricable effect on . . . foreign policy").

57.     In addition, Plaintiff's claims are preempted by the Clean Air Act.  A state cause of action is preempted under this "complete preemption" doctrine where a federal statutory scheme "provide[s] the exclusive cause of action for the claim asserted and also set[s] forth procedures and remedies governing that cause of action." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003). It also requires a determination that the state-law cause of action falls within the scope of the federal cause of action, including where it "duplicates, supplements, or supplants" that cause of action. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).

58.     Both requirements for complete preemption are present here.  Among other things, Plaintiff's Complaint seeks an "abatement" of a nuisance it alleges Defendants have caused—namely, a rise in ocean temperatures and an increase in marine heatwaves, causing algal blooms that have allegedly contaminated Dungeness crab populations.  As such, it seeks regulation of greenhouse gas emissions far beyond the borders of the United States.  This can be accomplished only by a nationwide and global reduction in the emission of greenhouse gases.  Even assuming that such relief can be ordered against Defendants for their production and sale of fossil fuels, which are then combusted by others at a rate Plaintiff claims causes the alleged injuries, this claim must be decided in federal court because Congress has created a cause of action by which a party can seek the creation or modification of nationwide emission standards by petitioning the EPA.  That federal cause of action was designed to provide the exclusive means by which a party can seek nationwide emission regulations. Because Plaintiff's state causes of action would "duplicate[], supplement[], or supplant[]" that exclusive federal cause of action, they are completely preempted.  "If a federal common law cause of action has been extinguished by Congressional displacement, it would be incongruous to allow it to be revived in any form." *Kivalina*, 696 F.3d at 857.

**A.     The Clean Air Act Provides the Exclusive Cause of Action for Challenging EPA Rulemakings.**

59.     The Clean Air Act permits private parties, as well as state and municipal governments, to challenge EPA rulemakings (or the absence of such) and to petition the EPA to undertake new rulemakings.  *See, e.g.*, 5 U.S.C. § 553(e); 42 U.S.C. §§ 7604, 7607.

60. The Clean Air Act provides the exclusive cause of action for regulation of nationwide emissions. The Act establishes a system by which federal and state resources are deployed to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). At the heart of this system are the emission standards set by EPA. Specific Clean Air Act provisions authorize or require emission standards to be set if certain findings are made, and such standards must comport with the statutory criteria set by Congress, consistent with the dual goals of the Act. Under the Clean Air Act, "emissions have been extensively regulated nationwide." *N.C. ex rel. Cooper v. Tenn Valley Auth.*, 615 F.3d 291, 298 (4th Cir. 2010). Regulation of greenhouse gas emissions, including carbon dioxide, is governed by the Clean Air Act, *see Massachusetts*, 549 U.S. at 528-29, and EPA has regulated these emissions under the Act, *see, e.g.*, 40 C.F.R. §§ 51.166(b)(1)(i), 52.21(b)(1)(i) (regulation of greenhouse gases through the Act's prevention of significant deterioration of air quality permitting program); 77 Fed. Reg. 62,624 (Oct. 15, 2012) (regulation of greenhouse gas emissions from light-duty motor vehicles); 81 Fed. Reg. 73,478 (Oct. 25, 2016) (regulation of greenhouse gas emissions from medium- and heavy-duty engines and motor vehicles).

61. Congress manifested a clear intent that judicial review of Clean Air Act matters must take place in federal court. 42 U.S.C. § 7607(b).

62. This congressionally provided statutory and regulatory scheme is thus the "exclusive" means for seeking the nationwide regulation of greenhouse gas emissions and "set[s] forth procedures and remedies" for that relief, *Beneficial Nat'l Bank*, 539 U.S. at 8, irrespective of the savings clauses applicable to some other types of claims. At least one federal court has observed that the Clean Air Act preempts such state common law nuisance cases because "[i]f courts across the nation were to use the vagaries of public nuisance doctrine to overturn the carefully enacted rules governing airborne emissions, it would be increasingly difficult for anyone to determine what standards govern. Energy policy cannot be set, and the environment cannot prosper, in this way." *N.C. ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d at 298.

Gibson, Dunn & Crutcher LLP

**B.   Plaintiff's Asserted State-Law Causes of Action Duplicate, Supplement, and/or Supplant the Federal Cause of Action.**

63.    Plaintiff asks the Court to grant "[e]quitable relief, including abatement of the nuisance complained of."  Compl. Prayer for Relief.

64.    The alleged nuisances can be abated only by a global—or at the very least national—reduction in greenhouse gas emissions.  *See* Compl. ¶ 68 ("[I]t is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gases quickly diffuse and comingle in the atmosphere."); *id.* ¶ 69 (describing "global" greenhouse gas emissions relating to fossil fuel products).  Indeed, Plaintiff's allegations purport to show that Defendants "undertook a momentous effort to evade *international* and *national* regulation of greenhouse gas emissions"—*not* state or local regulations.  *Id.* ¶ 141 (emphases added); *see also id.* ¶ 159 ("Defendants embarked on a decades-long campaign designed to . . . undermine national and international efforts to rein in greenhouse gas emissions."); *id.* ¶ 114 (acknowledging, *inter alia*, federal legislative efforts to regulate $CO_2$ and other greenhouse gases that allegedly "prompted Defendants to change their tactics . . . to a public campaign aimed at evading regulation"); *id.* ¶¶ 41(3), 129, 132, 133 (describing alleged efforts to encourage the United States to reject the international Kyoto Protocol).

65.    Plaintiff's state-law tort claims are effectively an end-run around a petition for a rulemaking regarding greenhouse gas emissions because they seek to regulate nationwide emissions that Plaintiff concedes conform to EPA's emission standards.  *See, e.g.*, *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 539 (1992).  The claims would require precisely the cost-benefit analysis of emissions that the EPA is charged with undertaking and would directly interfere with the EPA's determinations.  *See supra* ¶¶ 33–35.  Because Congress has established a clear and detailed process by which a party can petition the EPA to establish stricter nationwide emissions standards, Plaintiff's claims are completely preempted by the Clean Air Act.

Gibson, Dunn & Crutcher LLP

66.     Because Congress has provided an exclusive statutory remedy for the regulation of greenhouse gas emissions which provides federal procedures and remedies for that cause of action, and because Plaintiff's claims fall within the scope of the federal cause of action, Plaintiff's claims are completely preempted by federal law and this Court has federal-question jurisdiction.

## VII.     THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

67.     The Federal Officer Removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1).  "A party seeking removal under section 1442 must demonstrate that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Durham*, 445 F.3d at 1251 (citations omitted).  All three elements are satisfied here for the Chevron Parties and many other Defendants, which have engaged in activities pursuant to the directions of federal officers that, assuming the truth of Plaintiff's allegations, have a causal nexus to Plaintiff's claims, and which have colorable federal defenses to Plaintiff's claims, including, for example, performing pursuant to government mandates and contracts, performing functions for the U.S. military, and engaging in activities on federal lands pursuant to federal leases.

68.     First, Defendants are "persons" within the meaning of the statute.  The Complaint alleges that Defendants are corporations (Compl. ¶ 45), which the Ninth Circuit has held qualify as "person[s]" under the statute.  *See Leite*, 749 F.3d at 1122 n.4.

69.     Second, assuming the truth of Plaintiff's allegations, there is a causal nexus between Defendants' alleged actions, taken pursuant to a federal officer's direction, and Plaintiff's claims.  In *Leite*, the Ninth Circuit held removal proper where a military contractor, which was sued for failing to warn about asbestos in military equipment, showed extensive evidence of federal control over its activities.  This included "detailed specifications governing the form and content of all warnings that equipment manufacturers were required to provide," which the Navy was directly involved in prepar-

ing and which could not be altered.  749 F.3d at 1123.  Here, Plaintiff's causation and damages alle-

gations depend on the activities of Defendants over the past decades—many of which were under-

taken at the direction of, and under close supervision and control by, federal officials.

70.     To take only one example, the Chevron Parties and other Defendants have long ex-

plored for and produced minerals, oil and gas on federal lands pursuant to leases governed by the

Outer Continental Shelf Lands Act, as described above.  *E.g.*, Thomson Decl., Exs. B, C.  In doing

so, those Defendants were "'acting under' a federal 'official'" within the meaning of Section

1442(a)(1).  *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 153 (2007).  Under OCSLA, the Inte-

rior Department is charged with "manag[ing] access to, and . . . receiv[ing] a fair return for, the en-

ergy and mineral resources of the Outer Continental Shelf."  Statement of Walter Cruickshank, Dep-

uty Director, Bureau of Ocean Energy Management, Before The Committee On Natural Resources,

July, 6, 2016, *available at* https://www.boem.gov/Congressional-Testimony-Cruickshank-07062016/.

To fulfill this statutory obligation, the Interior officials maintain and administer the OCS leasing pro-

gram, under which parties such as Defendants are required to conduct exploration, development and

production activities that, "in the absence of a contract with a private firm, the Government itself

would have had to perform."  *Watson*, 551 U.S. at 154; *see Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d

1095, 1101 n.3 (9th Cir. 2018) (noting that "a private actor" may qualify as a federal officer by

"'helping the Government to produce an item that it needs' pursuant to a federal contract") (quoting

*Watson*, 551 U.S. at 153).

71.     OCS leases obligate lessees like Defendants to "develop[] . . . the leased area" dili-

gently, including carrying out exploration, development and production activities approved by Inte-

rior Department officials for the express purpose of "maximiz[ing] the ultimate recovery of hydrocar-

bons from the leased area."  Thomson Decl., Ex. C § 10.  Indeed, for decades Defendants' OCSLA

leases have instructed that "[t]he Lessee *shall comply* with all applicable regulations, orders, written

instructions, and the terms and conditions set forth in this lease" and that "[a]fter due notice in writ-

ing, the Lessee *shall conduct* such OCS mining activities at such rates as the Lessor may require in

order that the Leased Area or any part thereof may be properly and timely developed and produced in

accordance with sound operating principles."  *Id.*, Ex. B § 10 (emphasis added).  All drilling takes

place "in accordance with an approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD) [as well as] approval conditions"—all of which must undergo extensive review and approval by federal authorities, and all of which further had to conform to "diligence" and "sound conservation practices." *Id.*, Ex. C §§ 9, 10. Federal officers further have reserved the rights to control the rates of mining (*id.*, Ex. B § 10) and to obtain "prompt access" to facilities and records (*id.*, Ex. B § 11, Ex. C § 12). The government also maintains certain controls over how the leased oil/gas/minerals are disposed of once they are removed from the ground, as by preconditioning the lease on a right of first refusal to purchase all materials "[i]n time of war or when the President of the United States shall so prescribe" (*id.*, Ex. B § 14, Ex. C § 15(d)), and mandating that 20% of all crude and natural gas produced pursuant to drilling leases be offered "to small or independent refiners" (*id.*, Ex. C § 15(c)). The Federal Treasury has reaped enormous financial benefits from those policy decisions in the form of statutory and regulatory royalty regimes that have resulted in billions of dollars of revenue to the Federal Government.

72.     Certain Defendants have also engaged in the exploration and production of fossil fuels pursuant to agreements with federal agencies. For example, in June 1944, the Standard Oil Company (a Chevron predecessor) and the U.S. Navy entered into a contract "to govern the joint operation and production of the oil and gas deposits . . . of the Elk Hills Reserve," a strategic petroleum reserve maintained by the Navy. *Chevron U.S.A., Inc. v. United States*, 116 Fed. Cl. 202, 205 (Fed. Cl. 2014). "The Elk Hills Naval Petroleum Reserve (NPR-1) . . . was originally established in 1912 to provide a source of liquid fuels for the armed forces during national emergencies." GAO Fact Sheet, Naval Petroleum Reserves – Oil Sales Procedures and Prices at Elk Hills, April Through December 1986 (Jan. 1987) ("GAO Fact Sheet"), *available at* http://www.gao.gov/assets/90/87497.pdf. In response to the OPEC oil embargo in 1973–74, the Naval Petroleum Reserves Production Act of 1976 (Public Law 94-258, April 5, 1976) was enacted, which "authorized and directed that NPR-1 be produced at the maximum efficient rate for 6 years." *Id.* In 1977, Congress "transferred the Navy's interests and management obligations to [the Department of Energy]," and Chevron continued its interest in the joint operation until 1997. *Id.* That contract governing Standard's rights shows the federal

government's "full and absolute" power and "complete control" over fossil fuel exploration, production, and sales at the reserve:

- The plan was designed to "[a]fford [the] Navy a means of acquiring *complete control over the development of the entire Reserve and the production of oil therefrom*." Thomson Decl., Ex. D, Recitals § 6(d)(i) (emphases added).

- "[The] Navy shall, subject to the provisions hereof, have the exclusive control over the exploration, prospecting development and operation of the Reserve[.]" *Id.*, Ex. D § 3(a).

- "[The] Navy shall have *full and absolute power* to determine from time to time the rate of prospecting and development on, and the quantity and rate of production from, the Reserve, and may from time to time shut in wells on the Reserve if it so desires." *Id.*, Ex. D § 4(a) (emphasis added).

- "[A]ll exploration, prospecting, development, and producing operations on the Reserve" occurred "under the supervision and direction of an Operating Committee" tasked with "supervis[ing]" operations and "requir[ing] the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the reserve." Ex. D § 3(b). In the event of disagreement, "such matter shall be referred to the Secretary of the Navy for determination; and his decision in each such instance shall be final and binding upon Navy and Standard." *Id.*, Ex. D § 9(a).

- The Navy retained ultimate and even "absolute" discretion to suspend production, decrease the minimum amount of production per day that Standard was entitled to receive, or increase the rate of production. *Id.*, Ex. D §§ 4(b), 5(d)(1).

The contract demonstrates that Defendants' activities under federal officers went far beyond simple compliance with the law or participation in a regulated industry.

73. Defendants also have supplied motor vehicle fuels under agreements with the federal government, including the Armed Forces. For instance, CITGO Petroleum Corporation ("CITGO") was a party to fuel supply agreements with the Navy Exchange Service Command ("NEXCOM"), which is a department of the Naval Supply Systems Command of the U.S. Navy. Among other things, NEXCOM sells goods and services at a savings to active duty military, retirees, reservists, and their families. Starting in approximately 1988 through approximately 2012, pursuant to its agreements with NEXCOM, CITGO supplied CITGO branded gasoline and diesel fuel to NEXCOM for service stations operated by NEXCOM on Navy bases located in a number of states across the country. The NEXCOM agreements contained detailed fuel specifications, and CITGO complied with these government specifications in supplying the fuel to NEXCOM. CITGO also contracted with

NEXCOM to provide demolition, site preparation, design, construction, and related financing services to build new gasoline service stations on Navy bases in the 1990s.

74.     As discussed below, these and other federal activities are encompassed in Plaintiff's Complaint.  *See infra* ¶¶ 76–82.  Plaintiff alleges that the drilling and mining operations Defendants performed led to the sale of fossil fuels—including to the Federal Government—which led to the release of greenhouse gases by end-users—including the Federal Government.  Furthermore, the oil and gas Defendants extracted—which the Federal Government (i) reserved the right to buy in total in the event of a time of war or whenever the President so prescribed and (ii) has purchased from Defendants to fuel its military operations—is the very same oil and gas that Plaintiff alleges is a "defective" product giving rise to strict liability.  Accordingly, Plaintiff seeks to hold Defendants liable for the very activities Defendants performed under the control of a federal official, and thus the nexus element has been satisfied.

75.     Third, Defendants intend to raise numerous meritorious federal defenses, including preemption, *see Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1249–50 (9th Cir. 2017), the government contractor defense, *see Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); *Gertz v. Boeing*, 654 F.3d 852 (9th Cir. 2011), and others.  In addition, Plaintiff's claims are barred by the United States Constitution, including the Commerce and Due Process clauses, as well as the First Amendment and the foreign affairs doctrine.  These and other federal defenses are more than colorable.  *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed").  Accordingly, removal under Section 1442 is proper.

## VIII.   THE ACTION IS REMOVABLE UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

76.     This Court also has original jurisdiction pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), because this action "aris[es] out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals."  43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline*, 87 F.3d at 155; *In re Deepwater Horizon*,

Gibson, Dunn & Crutcher LLP

NOTICE OF REMOVAL

745 F.3d 157, 163 (5th Cir. 2014) ("th[e] language [of § 1349(b)(1)] [i]s straightforward and broad"). The outer continental shelf ("OCS") includes all submerged lands that belong to the United States but are not part of any State.  43 U.S.C. §§ 1301, 1331.

77.     The breadth of federal jurisdiction granted by OCSLA reflects the Act's "expansive substantive reach."  *See EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994). "OCSLA was passed . . . to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources."  *Id.* at 566.  "[T]he efficient exploitation of the minerals of the OCS . . . was . . . a primary purpose for OCSLA."  *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).  Indeed, OCSLA declares it "to be the policy of the United States that . . . the outer Continental Shelf . . . should be made available for expeditious and orderly development."  43 U.S.C. § 1332(3).  It further provides that "since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States . . . such States, and through such States, affected local governments, are entitled to an opportunity to participate, *to the extent consistent with the national interest*, in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf."  *Id.* § 1332(4) (emphasis added).

78.     When enacting Section 1349(b)(1), "Congress intended for the judicial power of the United States to be extended to the entire range of legal disputes that it knew would arise relating to resource development on the [OCS]."  *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985).  Consistent with Congress' intent, courts repeatedly have found OCSLA jurisdiction where resolution of the dispute foreseeably could affect the efficient exploitation of minerals from the OCS.[2]  *See, e.g.*, *EP Operating*, 26 F.3d at 569–70; *United Offshore v. S. Deepwater Pipeline*, 899 F.2d 405, 407 (5th Cir. 1990).

---

[2]  As stated in 43 U.S.C. § 1333(a)(1):  "The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed . . . for the purpose of exploring for, developing, or producing resources therefrom . . . to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State . . . ."

79.     OCSLA jurisdiction exists even if the Complaint pleads no substantive OCSLA claims.  *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d at 163.  The Court, moreover, may look beyond the facts alleged in the Complaint to determine that OCSLA jurisdiction exists.  *See, e.g.*, *Plains Gas Solutions, LLC v. Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014); *St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 2011 A.M.C. 2624, 2640 (D. Del. 2011) (citing *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1205 (5th Cir. 1998)).

80.     Under OCSLA, the Department of Interior administers an extensive federal leasing program aiming to develop and exploit the oil and gas resources of the federal Continental Shelf.  43 U.S.C. § 1334 *et seq.*  Pursuant to this authority, the Interior Department "administers more than 5,000 active oil and gas leases on nearly 27 million OCS acres.  In FY 2015, production from these leases generated $4.4 billion in leasing revenue . . . . [and] provided more than 550 million barrels of oil and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production and about five percent of domestic natural gas production."  Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Management, Before the House Committee on Natural Resources (Mar. 2, 2016), *available at* https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016.  Certain Defendants here, of course, participate very substantially in the federal OCS leasing program.  For example, from 1947 to 1995, Chevron U.S.A. Inc. produced 1.9 billion barrels of crude oil and 11 billion barrels of natural gas from the federal outer continental shelf in the Gulf of Mexico alone.  U.S. Dep't of Int., Minerals Mgmt. Serv., Gulf of Mex. Region, Prod. by Operator Ranked by Vol. (1947–1995), *available at* https://www.data.boem.gov/Produc-tion/Files/Rank%20File%20Gas%201947%-20-%201995.pdf.  In 2016, Chevron U.S.A. produced over 49 million barrels of crude oil and 50 million barrels of natural gas from the outer continental shelf on the Gulf of Mexico.  U.S. Dep't of Int., Bureau of Safety & Envtl. Enf't, Gulf of Mex. Re-gion, Prod. by Operator Ranked by Vol. (2016), *available at* https://www.data.boem.gov/Produc-tion/Files/Rank%20File%20Gas%202016.pdf.  Numerous other Defendants conduct, and have for decades conducted, similar oil and gas operations on the federal OCS; indeed, Defendants and their affiliated companies presently hold approximately 32.95% of all outer continental shelf leases.  *See*

Gibson, Dunn & Crutcher LLP

Bureau of Ocean Energy Management, Lease Owner Information, *available at* https://www.data.boem.gov/Leasing/LeaseOwner/Default.aspx.  For example, certain BP companies and Exxon Mobil currently own lease interests in, and the BP companies operate, "one of the largest deepwater producing fields in the Gulf of Mexico," which is capable of producing up to 250,000 barrels of oil per day.  *See* Thunder Horse Field Fact Sheet (last visited Aug. 21, 2017), *available at* http://www.bp.com/content/dam/bp-country/en_us/PDF/Thunder_Horse_Fact_Sheet_6_14_2013.pdf.  And as noted on the BP website, production from this and other OCS activities will continue into the future.  *Id.* ("BP intends to sustain its leading position as an active participant in all facets of the Deepwater US Gulf of Mexico—as an explorer, developer, and operator.").  A substantial portion of the national consumption of fossil fuel products stems from production on federal lands, as approved by Congress and Executive Branch decision-makers.

81.    The Complaint itself makes clear that a substantial part of Plaintiff's claims "'arise[] out of, or in connection with," Defendants' "operation[s] 'conducted on the outer Continental Shelf" that involve "the exploration and production of minerals."  *In re Deepwater Horizon*, 745 F.3d at 163.  Plaintiff, in fact, challenges *all of* Defendants' "extraction . . . of coal, oil, and natural gas" activities (Compl. ¶ 4), a substantial quantum of which arise from outer continental shelf operations, *see* Ranking Operator by Oil, Bureau of Ocean Energy Mgmt., *available at* https://www.data.boem.gov/Main/HtmlPage.aspx?page=rankOil (documenting Chevron's oil and natural gas production on the federal outer continental shelf from 1947 to 2017).  Plaintiff alleges that emissions have risen due to increased outer continental shelf extraction technologies.  *See, e.g.*, Compl. ¶ 143 (discussing arctic offshore drilling equipment and patents which may be relevant to conduct near Alaskan outer continental shelf).  And Plaintiff challenges energy projects that occurred in the Gulf of Mexico.  Compl. ¶¶ 25(e), 31(a), 33(a).  Defendants conduct similar activity in American waters and many of the emissions Plaintiff challenges necessarily arise from the use of fossil fuels extracted from the OCS.

82.    The relief sought also arises out of and impacts OCS extraction and development.  *See, e.g.*, Compl., Prayer for Relief (seeking damages designed to cripple the energy industry and equitable relief that would no doubt rein in extraction, including that on the OCS).  And "any dispute

1   that alters the progress of production activities on the OCS threatens to impair the total recovery of

2   the federally-owned minerals from the reservoir or reservoirs underlying the OCS.  Congress in-

3   tended such a dispute to be within the grant of federal jurisdiction contained in § 1349."  *Amoco*

4   *Prod. Co.*, 844 F.2d at 1211.

5   **IX.    THE ACTION IS REMOVABLE UNDER THE CLASS ACTION FAIRNESS ACT**

6        83.    Plaintiff's lawsuit is removable under the Class Action Fairness Act, 28 U.S.C.

7   §§ 1332(d) and 1453(b), because (i) Plaintiff is pursuing the equivalent of a class action as part of this

8   suit; (ii) each of CAFA's statutory requirements are satisfied; and (iii) litigation of this case in federal

9   court promotes CAFA's overall purpose.  Jurisdiction under CAFA is measured at the time of re-

10   moval.  28 U.S.C. § 1332(d).

11        84.    CAFA allows removal of any "class action" where minimal diversity exists, at least

12   100 class members are represented, and "the matter in controversy exceeds the sum or value of

13   $5,000,000, exclusive of interests and costs."  28 U.S.C. § 1332(d)(1)(2), (5); *see also* 28 U.S.C.

14   § 1453(b).

15        85.    As relevant here, CAFA defines "class action" as "any civil action filed under rule 23

16   of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authoriz-

17   ing an action to be brought by 1 or more representative persons as a class action."  *Id.*

18   § 1332(d)(1)(B).  Consistent with Congress's objective to favor federal diversity jurisdiction over

19   class actions with interstate ramifications, *see Dart Cherokee Basin Operating Co., LLC v. Owens*,

20   135 S. Ct. 547, 554 (2014), "the definition of 'class action' is to be interpreted liberally.  Its applica-

21   tion should not be confined solely to lawsuits that are labelled 'class actions' . . . . Generally speak-

22   ing, lawsuits that resemble a purported class action should be considered class actions for the purpose

23   of applying these provisions."  S. Rep. No. 109-14, at 35 (2005), as reprinted in 2005 U.S.C.C.A.N.

24   3, 34.

25        86.    This lawsuit is "in substance a class action," and therefore it is properly removable un-

26   der CAFA.  *Addison Automatics, Inc. v. Hartford Cas. Ins. Co.*, 731 F.3d 740, 742 (7th Cir. 2013)

27   (holding that plaintiff's individual suit was a "class action" and properly removed to federal court un-

28

der CAFA, notwithstanding plaintiff's "artificial attempt to disguise the true nature of the suit"). California courts recognize that a trade association generally lacks standing to pursue damages on behalf of its members. *See Airline Pilots Ass'n Int'l. v. United Airlines, Inc.*, 223 Cal. App. 4th 706, 726 (Ct. App. 2014). Therefore, to the extent a "trade association" is allowed to recover on behalf of its members, it can do so only by "representing . . . a class" of persons. *ABC Int'l Traders, Inc. v. Matsushita Electric Corp.*, 14 Cal. 4th 1247, 1257 (1997); *see also Residents of Beverly Glen, Inc. v. City of Los Angeles*, 34 Cal. App. 3d 117, 126 n.10 (Ct. App. 1973) (an association's standing to sue in a representative capacity on behalf of its members "require[s] the existence of a community of interest between the members of the class"). Moreover, Plaintiff expressly seeks to represent not only "its members," but also "the west coast fishing community" at large. *Id.* ¶ 16 ("Plaintiff . . . in a representative capacity on behalf of its members and the west coast fishing community . . . ."); *see also id.* ¶ 19 ("PCFFA brings these claims . . . as a representative of its members that are and will continue to be injured financially and otherwise by Defendants' conduct . . . ."). And Plaintiff seeks relief on behalf of all members of that community—not simply those whom it represents. *See, e.g., id.* ¶ 201 ("As a direct and proximate result of the defects previously described, fossil fuel products caused and will continue to cause Plaintiff to sustain the injuries and damages set forth in this Complaint, including economic loss, damage to natural resources held in the public trust, deprivation of the right to use fishing privileges, and the creation and maintenance of a nuisance that interferes with the rights of Plaintiff *and commercial fishery-dependent communities along the west coast*.") (emphasis added).

87.     The minimal diversity necessary for CAFA jurisdiction is present in this case because at least one class member is a citizen of a different state than at least one defendant. *See* 28 U.S.C. § 1332(d)(2)(A). On information and belief, Plaintiff and virtually all (if not all) of those it seeks to represent are citizens of California, Oregon, or Washington. All but two of the defendants in this suit are citizens of different states. *See* Compl. ¶¶ 24–38. The only defendants with either a place of incorporation or principal place of business in California, Washington, or Oregon are Chevron Corp. and Chevron U.S.A. Inc. *Id.* ¶ 23.

88.     The number of represented plaintiffs necessary for CAFA jurisdiction is present in this case because PCFFA claims to represent "its members and the west coast fishing community," which, on information and belief, is greater than 100 class members. *Id.* ¶ 16.

89.     The amount in controversy requirement for CAFA is met because plaintiff's claims on behalf of the class exceed $5,000,000. 28 U.S.C. § 1332(d)(2).  Although Plaintiff alleges no specific amount of damages, "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee*, 135 S. Ct. at 554.  In making such determination, "the claims of the individual class members shall be aggregated."  28 U.S.C. § 1332(d)(6).  Here, Plaintiff alleges that Defendants' conduct has contributed to "domoic acid outbreaks that forced California and Oregon to close their commercial crab fisheries during each of the last three seasons and will compel them to close the fisheries during future seasons."  Compl. ¶ 74.  As noted *supra*, the U.S. Secretary of Commerce has devoted $25.6 million to compensate those affected only in California and only for the 2015-16 fishery closures.  And based on Plaintiff's own public statement: "In California, Dungeness crab is the most economically productive fishery, accounting for as much as $95 million in ex-vessel revenue annually."  PCFFA, *Groundfish, Crab and Other Fisheries*, https://pcffa.org/fisheries/ (last visited Dec. 4, 2018).

90.     Finally, removal of this case will further Congress's overall purpose in enacting CAFA, "to strongly favor the exercise of federal diversity jurisdiction over class actions with inter-state ramifications."  S. Rep. No. 109-14, at 35; *see also Dart Cherokee*, 135 S. Ct. at 554 ("CAFA's primary objective is to ensur[e] Federal court consideration of interstate cases of national im-portance." (citation omitted)); *Standard Fire Ins. Co. v. Knowles*, 133 S.Ct. 1345, 1350 (2013) (same).  As described more fully above, Plaintiff's claims necessarily raise issues of national and in-ternational importance and therefore belong in federal court.

## X.     THE ACTION IS REMOVABLE BECAUSE THIS CASE ARISES FROM ACTS ARISING FROM MULTIPLE FEDERAL ENCLAVES

91.     This Court also has original jurisdiction under the federal enclave doctrine.  The Con-stitution authorizes Congress to "exercise exclusive legislation in all cases whatsoever" over all places purchased with the consent of a state "for the erection of forts, magazines, arsenals, dock-

Gibson, Dunn & Crutcher LLP

yards, and other needful buildings." U.S. Const., art. I, § 8, cl. 17. "Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'" *Durham*, 445 F.3d at 1250; *see also Totah v. Bies*, No. C 10-05956 CW, 2011 WL 1324471, at *2 (N.D. Cal. Apr. 6, 2011) (denying motion to remand where defamation claim arose in the Presidio in San Francisco, a federal enclave). The "key factor" in determining whether a federal court has federal enclave jurisdiction "is the location of the plaintiff's injury or where the specific cause of action arose." *Sparling v. Doyle*, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014); *see also Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992) ("Failure to indicate the federal enclave status and location of the exposure will not shield plaintiffs from the consequences of this federal enclave status."); *Bd. of Comm'rs of Se. La. Flood Protection Auth.-E. v. Tenn. Gas Pipeline Co.*, *LLC*, 29 F. Supp. 3d 808, 831 (E.D. La. 2014) (noting that defendants' "conduct" or "the damage complained of" must occur on a federal enclave). Federal jurisdiction is available if some of the events or damages alleged in the complaint occurred on a federal enclave. *See Durham*, 445 F.3d at 1250; *Bell v. Arvin Meritor, Inc.*, No. 12-00131-SC, 2012 WL 1110001, at *2 (N.D. Cal. Apr. 2, 2012) (finding federal enclave jurisdiction where "some of the[] locations . . . are federal enclaves"); *Totah*, 2011 WL 1324471, at *2 (holding that court can "exercise supplemental jurisdiction over related claims" that did not arise on federal enclave).

92.    Three requirements exist for land to be a federal enclave: (1) the United States must have acquired the land from a state; (2) the state legislature must have consented to the jurisdiction of the Federal Government; and (3) the United States must have accepted jurisdiction. *Wood v. Am. Crescent Elevator Corp.*, No. 11-397, 2011 WL 1870218, at *2 (E.D. La. May 16, 2011).

93.    On information and belief, Defendants maintain or maintained oil and gas operations on military bases or other federal enclaves such that the Complaint, which bases the claims on the "extracting, refining, processing, producing, promoting and[/or] marketing of fossil fuel products" (Compl. ¶ 21), arises under federal law. *See, e.g.*, *Humble Pipe Line Co. v. Waggoner*, 376 U.S. 369, 372 (1964) (noting that the United States exercises exclusive jurisdiction over oil and gas rights within Barksdale Air Force Base in Louisiana); *see also Mississippi River Fuel Corp. v. Cocreham*, 390 F.2d 34, 35 (5th Cir. 1968) (on Barksdale AFB, "the reduction of fugitive oil and gas to possession and ownership[] takes place within the exclusive jurisdiction of the United States"). Indeed, as

of 2000, approximately 14% of the National Wildlife Refuge System "had oil or gas activities on their land," and these activities were spread across 22 different states.  *See* GAO, *U.S. Fish and Wild-life Service: Information on Oil and Gas Activities in the National Wildlife Refuge* (Oct. 30, 2001), *available at* http://www.gao.gov/new.items/d0264r.pdf.  Furthermore, Chevron and its predecessor companies for many years engaged in production activities on the Elk Hills Reserve—a strategic oil reserve maintained by the Naval Department—pursuant to a joint operating agreement with the Navy.  *See Chevron U.S.A.*, 116 Fed. Cl. at 205.  Pursuant to that agreement, Standard Oil "operat[ed] the lands of Navy and Standard in the Reserve."  Thomson Decl., Ex. D at 4.

94.     In addition, the Complaint relies upon conduct occurring in the District of Columbia—itself a federal enclave, *see, e.g.*, *Collier v. District of Columbia*, 46 F. Supp. 3d 6 (D.D.C. 2014); *Hobson v. Hansen*, 265 F. Supp. 902, 930 (D.D.C. 1967)—as a basis for Plaintiff's claims.  Indeed, Plaintiff complains that Defendants' supposedly wrongful conduct included their memberships in various "trade association[s]," and providing funding to "think tanks," which allegedly had the effect of "evad[ing] regulation" of fossil fuel products by "deceiv[ing]" policymakers about the role of fossil fuel products in causing global warming.  Compl. ¶¶ 137–38, 142.  As the Ninth Circuit contemplated in *Jacobson v. U.S. Postal Serv.*, 993 F.2d 649, 657 (9th Cir. 1992), free speech placed at issue in a federal enclave falls under the jurisdiction of the federal courts.  *Id.* (observing that newspaper vendors were required to obtain permits pursuant to a federal statute to sell newspapers in front of U.S. post office locations, which the Court deemed to be "within the federal enclave").  Because Plaintiff claims that Defendants' speech within the federal enclave of the District of Columbia was, among other alleged causes, the basis of its injury, this Court is the only forum suited to adjudicate the merits of this dispute.

## XI.     THE ACTION IS REMOVABLE UNDER THE BANKRUPTCY REMOVAL STATUTE

95.     The Bankruptcy Removal Statute allows removal of "any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or

Gibson, Dunn & Crutcher LLP

NOTICE OF REMOVAL

1    cause of action under section 1334 of this title."  28 U.S.C. § 1452(a).  Section 1334, in turn, provides

2    that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings, aris-

3    ing under Title 11, or arising in or related to cases under title 11" of the United States Code.

4    28 U.S.C. § 1334(b).  The Ninth Circuit has emphasized that "'related to' jurisdiction is very broad,

5    including nearly every matter directly or indirectly related to the bankruptcy." *Sasson v. Sokoloff* (*In*

6    *re Sasson*), 424 F.3d 864, 868 (9th Cir. 2005).  An action is thus "related to" a bankruptcy case if it

7    "'could conceivably have any effect on the estate being administered in bankruptcy.'"  *PDG Arcos,*

8    *LLC*, 436 F. App'x at 742 (quoting *In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988)).  Where a Chapter

9    11 plan has been confirmed, there must be a "close nexus" between the post-confirmation case and

10   the bankruptcy plan for related-to jurisdiction to exist.  *In re Pegasus Gold Corp.*, 394 F.3d 1189,

11   1194 (9th Cir. 2005) (citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 166-67 (3d Cir. 2004)).  "[A] close

12   nexus exists between a post-confirmation matter and a closed bankruptcy proceeding sufficient to

13   support jurisdiction when the matter 'affect[s] the interpretation, implementation, consummation, ex-

14   ecution, or administration of the confirmed plan.'"  *In re Wilshire Courtyard*, 729 F.3d 1279, 1289

15   (9th Cir. 2013) (quoting *Pegasus Gold*, 394 F.3d at 1194).

16         96.    Plaintiff's claims are purportedly predicated on historical activities of Defendants, in-

17   cluding predecessor companies, subsidiaries, and companies that Defendants may have acquired or

18   with which they may have merged, as well as numerous unnamed but now bankrupt entities.  Indeed,

19   Plaintiff explicitly premises its theories of liability on the actions of Defendants' subsidiaries.  *See,*

20   *e.g.*, Compl ¶¶ 23(f), 194, 208.[3]  Because there are hundreds of non-joined necessary and indispensa-

21   ble parties, there are many other Title 11 cases that may be related.  Indeed, the related climate-

22   change cases recently filed on behalf of other cities and counties already generated bankruptcy court

23   proceedings.  *See, e.g.*, *In re Peabody Energy Corp.*, 2017 WL 4843724, Case No. 16-42529 (Bankr.

24   E.D. Mo. Oct.24, 2017) (holding that the plaintiffs' state-law claims were discharged when Peabody

25   emerged from bankruptcy in March 2017); *In re Arch Coal, Inc.*, Case No. 16-40120, Dkt. 1615

---

[3]  To the extent Plaintiff seeks to hold Defendants liable for the conduct of their subsidiaries, affili-
ates or other related entities, such attempts are improper.  *See, e.g.*, *Gustavson v. Wrigley Sales
Co.*, 961 F. Supp. 2d 1100, 1132 (N.D. Cal. 2013) (holding that "parent-subsidiary relation-
ship . . . is an insufficient basis, standing alone, for holding [parent] liable for [subsidiary's] con-
duct").

(Bankr. E.D. Mo. Nov. 21 2017) (stipulation providing that any action in the Peabody bankruptcy proceedings that results in dismissal of any of the plaintiffs' claims against Peabody will require dismissal of claims against Arch).  Accordingly, Plaintiff's broad claim has the required "close nexus" with Chapter 11 plans to support federal jurisdiction.  *Wilshire Courtyard*, 729 F.3d at 1289; *see also In re Dow Corning Corp.*, 86 F.3d 482, 493–94 (6th Cir. 1996).

97.     As just one example of how Plaintiff's historical allegations have created a "close nexus" with a Chapter 11 plan, one of Chevron's current subsidiaries, Texaco Inc., filed for bankruptcy in 1987.  *In re Texaco Inc.*, 87 B 20142 (Bankr. S.D.N.Y. 1987).  The Chapter 11 plan, which was confirmed in 1988, bars certain claims against Texaco arising prior to March 15, 1988.  *Id.*, Dkt. 1743.[4]  Plaintiff's Complaint alleges that Texaco, as well as unnamed Chevron "predecessors" and "subsidiaries," engaged in culpable conduct prior to March 15, 1988, and it attributes this conduct to defendant "Chevron."  *See* Compl. ¶ 23.  Plaintiff's claim against Chevron thus is at least partially barred by Texaco's confirmed Chapter 11 plan to the extent that the claims relate to Texaco's conduct prior to 1988.  Accordingly, even though Texaco's Chapter 11 plan has been confirmed and consummated, Plaintiff's claim has a "close nexus" to the plan to support federal jurisdiction.  *See Wilshire Courtyard*, 729 F.3d at 1292–93 (federal court had "'related to' subject matter jurisdiction under the *Pegasus Gold* test despite the fact that the Plan transactions have been long since consummated").

98.     Finally, Plaintiff's action is primarily one to protect its "pecuniary interest."  *City & Cnty. of San Francisco v. PG&E Corp.*, 433 F.3d 1115, 1124 (9th Cir. 2006).  As demonstrated by Plaintiff's request for undisclosed compensatory damages, "punitive and exemplary damages," and "equitable disgorgement of all profits Defendants obtained through their" alleged conduct (*see, e.g.*, Compl. ¶ 185, Prayer for Relief), this action is primarily pecuniary in nature.  *See also id.* ¶¶ 172–78 (alleging that Plaintiff was deprived of a substantial portion of their annual revenue due to the closure of crab fisheries).

---

[4]  There are pending motions to reopen Texaco's bankruptcy case, which motions are being actively litigated in the Bankruptcy Court.  *See id.*, Dkt. 3923.

1

## XII.   THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER

2

99.     Based on the foregoing allegations from the Complaint, this Court has original juris-

3

diction over this action under 28 U.S.C. § 1331.  Accordingly, removal of this action is proper under

4

28 U.S.C. §§ 1332, 1334, 1441, 1442, 1452, and 1446, as well as 43 U.S.C. § 1349(b).

5

100.    The United States District Court for the Northern District of California is the appropri-

6

ate venue for removal pursuant to 28 U.S.C. § 1441(a) because it embraces the place where Plaintiff

7

originally filed this case, in the Superior Court of California for the County of San Francisco.  *See*

8

28 U.S.C. § 84(a); 28 U.S.C. § 1441(a).  Pursuant to Local Rule 3-2(e), the action should be assigned

9

to the San Francisco division of this Court.

10

101.    All defendants that have been properly joined and served (or purported to be served)

11

have consented to the removal of the action, *see* Thomson Decl., ¶ 4, and there is no requirement that

12

any party not properly joined and served consent.  *See City of Ann Arbor Employees' Ret. Sys. v.*

13

*Gecht*, No. C-06-7453EMC, 2007 WL 760568, at *8 (N.D. Cal. Mar. 9, 2007); 28 U.S.C.

14

§ 1446(b)(2)(A) (requiring consent only from "all defendants who have been properly joined and

15

served").[5]  Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings, and orders served on the

16

Chevron Parties is attached as Exhibit A to the Thomson Declaration.

17

102.    Upon filing this Notice of Removal, Defendants will furnish written notice to Plain-

18

tiff's counsel, and will file and serve a copy of this Notice with the Clerk of the Superior Court of

19

California for the County of San Francisco, pursuant to 28 U.S.C. § 1446(d).

20

Accordingly, Defendants remove to this Court the above action pending against them in the

21

Superior Court of California for the County of San Francisco.

22

23

24

25

26

27

---

28

[5]   In addition, bankruptcy removal under 28 U.S.C. § 1452 and federal officer removal "represent[] an exception to the general rule . . . that all defendants must join in the removal petition." *Ely Valley Mines, Inc. v. Hartford Accident & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981).

Gibson, Dunn & Crutcher LLP

1 | Respectfully submitted,

2 | Dated:  December 12, 2018                    GIBSON, DUNN & CRUTCHER LLP

3 |

4 |                                              By:      /s/ Theodore J. Boutrous, Jr.
                                                        Theodore J. Boutrous, Jr.

5 |
                                              Theodore J. Boutrous, Jr., SBN 132099
6 |                                             tboutrous@gibsondunn.com
                                              Andrea E. Neuman, SBN 149733
7 |                                             aneuman@gibsondunn.com
                                              William E. Thomson, SBN 187912
8 |                                             wthomson@gibsondunn.com
                                              Joshua S. Lipshutz, SBN 242557
9 |                                             jlipshutz@gibsondunn.com
                                              GIBSON, DUNN & CRUTCHER LLP
10 |                                            333 South Grand Avenue
                                              Los Angeles, CA 90071
11 |                                            Telephone:  213.229.7000
                                              Facsimile:  213.229.7520
12 |
                                              Herbert J. Stern (*pro hac vice* application forthcoming)
13 |                                            hstern@sgklaw.com
                                              Joel M. Silverstein (*pro hac vice* application forthcoming)
14 |                                            jsilverstein@sgklaw.com
                                              STERN & KILCULLEN, LLC
15 |                                            325 Columbia Turnpike, Suite 110
                                              P.O. Box 992
16 |                                            Florham Park, NJ 07932-0992
                                              Telephone:       973.535.1900
17 |                                            Facsimile:       973.535.9664

18 |                                            Neal S. Manne (SBN 94101)
                                              Johnny W. Carter (*pro hac vice* forthcoming)
19 |                                            Erica Harris (*pro hac vice* forthcoming)
                                              SUSMAN GODFREY LLP
20 |                                            1000 Louisiana, Suite 5100
                                              Houston, TX 77002
21 |                                            Telephone:  (713) 651-9366
                                              E-mail:  nmanne@susmangodfrey.com
22 |                                            jcarter@susmangodfrey.com
                                              eharris@susmangodfrey.com
23 |
                                              Steven Shepard (*pro hac vice* forthcoming)
24 |                                            SUSMAN GODFREY LLP
                                              1301 Avenue of the Americas
25 |                                            32nd Floor
                                              New York, NY 10019
26 |                                            Telephone:  (212) 336-8330
                                              E-mail:  sshepard@susmangodfrey.com
27 |
                                              *Attorneys for Defendants Chevron Corporation and*
28 |                                            *Chevron U.S.A., Inc.*